FILED
MARIE HIRST COURT CLERK
CANADIAN COUNTY, OKLAHOMA

MAY 1 7 2021

BY _Willie Wood_
DEPUTY

### IN THE DISTRICT COURT OF CANADIAN COUNTY
### STATE OF OKLAHOMA

| | | |
|---|---|---|
| HUMPHREY INSURANCE AND FINANCIAL SERVICES, INC., an Oklahoma corporation; and COURTNEY HUMPHREY, an Individual, | ) ) ) ) | SET FOR HEARING BEFORE JUDGE PAUL HESSE ON THE _18_ DAY OF _June_ _2021_ AT _10 A._ M |
| Plaintiffs, | ) ) | |
| v. | ) ) | Case No. CJ-2021-140 |
| STATE FARM MUTUAL AUTOMOBILE INS. CO.; STATE FARM LIFE INSURANCE CO.; STATE FARM FIRE AND CASUALTY CO.; STATE FARM GENERAL INSURANCE CO., a collection of foreign insurance companies; and CLARENCE HOLLEY, an individual, | ) ) ) ) ) ) ) | |
| Defendants. | ) ) | |

### DEFENDANT STATE FARM'S MOTION FOR PARTIAL DISMISSAL AND INCORPORATED MEMORANDUM OF LAW

Defendants State Farm Mutual Automobile Insurance Company, State Farm Life Insurance Company, State Farm Fire and Casualty Company, and State Farm General Insurance Company (collectively, "State Farm"), by and through undersigned counsel and pursuant to 12 Okla. St. § 2012(B)(6), hereby move to dismiss Plaintiffs' Petition (the "Petition"), in part, for failure to state a claim upon which relief can be granted.

I.    **Introduction and Factual Summary**

State Farm is the leading automobile and homeowner insurer in the United States, offering many insurance and financial services products to customers across the country. State Farm markets these products through approximately 19,200 independent contractor agents ("Agents"). Independent contractor State Farm Agents each enter into an Agent's Agreement with State Farm

("Agent's Agreement"), terminable at will by either party, which provides the terms upon which Agents are authorized to offer insurance and financial services products, and by which Agents agree that they will exercise the utmost integrity in the operation of their agencies, compliant with all State Farm policies and procedures, as well as all state and federal laws, rules and regulations.[1,][2]

This lawsuit concerns a now-former State Farm Agent, Courtney Humphrey ("Humphrey"). State Farm terminated Humphrey's Agent's Agreement effective November 20, 2020, after an investigation into her agency, Humphrey Insurance and Financial Services ("HIFS"), revealed compliance issues. The claims brought by Humphrey and HIFS (collectively, "Plaintiffs") against State Farm do not relate to the termination of the Agent's Agreement. Instead, Plaintiffs allege State Farm breached the Agent's Agreement by: "labeling Plaintiff HIFS as an Independent Contractor, but requiring Plaintiff HIFS to follow State Farm's procedures and processes; taking, moving and transferring clients and customers of Plaintiff HIFS's Agency to other State Farm agencies without justification; and wrongly interfering with Plaintiff HIFS's authority for employees of Plaintiff's HIFS's Agency." (Petition, ¶ 27.) While State Farm denies

---

[1] The Agent's Agreement between State Farm and Plaintiffs is attached hereto as Exhibit A. A court generally may not consider materials outside the pleadings when ruling on a motion to dismiss. However, courts applying Oklahoma law "may review…[a] policy without converting defendant's motion into one for summary judgment because the…policy is referred to in the petition and is central to plaintiff's claim…and plaintiffs do not challenge…its authenticity." *Mays v. Liberty Mut. Fire. Ins. Co.*, Case No. CIV-16-996-F, 2016 U.S. Dist. LEXIS 202280, at *5 n. 1 (W.D. Okla. Oct. 21, 2016). Here, the Agent's Agreement is central to Plaintiffs' claims against State Farm and is referenced repeatedly throughout the pleadings. (*See generally* Petition.) Accordingly, this Court may review the Agent's Agreement when ruling on State Farm's Motion for Partial Dismissal without converting the Motion into one for summary judgment.

[2] For the Court's reference, copies of any unreported cases cited in this brief will be attached hereto in one collective exhibit – Exhibit B.

these allegations, it submits that the parties' relationship is governed by the Agent's Agreement and is not presently moving to dismiss the breach of contract claim.

State Farm does, however, contend Plaintiffs' remaining claims against the companies for interference with contract/business relations, interference with prospective economic advantage, and defamation are improper and unsupportable by any set of facts that can be established, and should therefore be dismissed. (*See generally* Petition). State Farm further contends Plaintiffs' claim against Clarence Holley ("Holley") and State Farm for negligent misrepresentation/constructive fraud should similarly be dismissed.[3] (*Id.*, ¶¶ 57-68.) As explained more fully below, (1) Plaintiffs' "interference" claims fail because State Farm cannot interfere as a matter of law with an existing or prospective contract/business relationship to which it is a party or beneficiary; (2) Plaintiffs' defamation claim fails because Humphrey admits she engaged in the conduct that is central to that claim, and also because any purported statements made by State Farm about such conduct would be privileged and are insufficiently detailed to state a claim for relief; and (3) Plaintiffs' negligent misrepresentation/constructive fraud claim against Holley fails because Plaintiffs admitted to the misconduct causing their alleged damages. Accordingly, State Farm moves this Court to dismiss Plaintiff's Petition in part.[4]

## II.    Legal Standard for Motion to Dismiss under 12 Okla. St. § 2012(B)(6)

---

[3] It is not clear, based on the wording of the Petition, whether this claim is being asserted against State Farm. State Farm, however, moves to dismiss this claim against Holley because he was State Farm employee and because it is legally deficient. Holley has not yet been served.

[4] While State Farm denies Plaintiffs' claim for breach of contract as alleged in the Petition, State Farm is not moving to dismiss this claim at this time. State Farm respectfully directs the Court to State Farm's Answer, filed the same day as this Motion for Partial Dismissal.

The purpose of a motion to dismiss brought pursuant to Section 2012(B)(6) is to determine whether the plaintiff's complaint states a claim for relief. In considering a motion to dismiss, the Court must "take as true all of the challenged pleadings together with all reasonable inferences which may be drawn from them." *Indiana Nat. Bank v. State Dept. of Human Services,* 880 P.2d 371, 375-76 (Okla. 1994). As stated by the Oklahoma Supreme Court:

> The Pleading Code, specifically 12 O.S. 2011 § 2012(B)(6), allows for a motion to dismiss that is based upon a "failure to state a claim upon which relief may be granted." A § 2012(B)(6) motion must be filed "before pleading if a further pleading is permitted." *Id.* The purpose of a § 2012(B)(6) motion to dismiss is to test the law that governs the claim in litigation rather than to examine the underlying facts of that claim.

*See Richardson, Richardson and Boudreaux, PLCC v. Morrissey,* 283 P.3d 308, 309 (Okla. 2012) (internal citations omitted).

## III.    **Plaintiffs' Petition Fails to State a Claim for Relief and Should be Dismissed in Part.**

Plaintiffs' claims for interference with contract/business relations, interference with prospective economic advantage, defamation, and negligent misrepresentation/constructive fraud have not been (and cannot be) adequately pleaded. Even taking the facts pled as true, and making any reasonable inferences from them, the law governing these claims does not and cannot support a ruling in favor of Plaintiffs. *See Richardson,* 283 P.3d at 309. Accordingly, Plaintiffs' Petition should be dismissed, in part, for failure to state a claim under Section 2012(B)(6).

### A.    **Plaintiffs Cannot State a Viable Claim for Tortious Interference with Contract/Business Relations.**

To adequately plead a claim for tortious interference with a contractual or business relationship, Plaintiffs must allege, "(1) interference with an existing contractual or business right;

{S569724;}                                    4

(2) such interference was malicious or wrongful; (3) the interference was neither justified, privileged nor excusable; and (4) the interference proximately caused damage." *Craig Pc Sales & Serv. v. Co. V,* Case No. CIV-17-003-F, 2018 U.S. Dist. LEXIS 239280, at \*9 (W.D. Okla. April 30, 2018) (citing *Wilspec Technologies, Inc. v. DunAn Holding Group, Co., Ltd.*, 204 P.3d 69, 74 (Okla. 2009)). A claim for tortious interference is viable *only* when the interference was done by one who is *not* a party to the contract or business relationship. *Wilspec,* 204 P.3d at 74 (emphasis added). In addition, the element of malice requires a showing of bad faith and means, "an unreasonable and wrongful act done intentionally, without just cause or excuse." *Tuffy's Inc. v. City of Oklahoma City*, 212 P.3d 1158, 1165 (Okla. 2009). Plaintiffs' claim fails because State Farm cannot interfere with existing contractual or business relations to which it was a party, nor do Plaintiffs allege sufficient facts showing State Farm interfered maliciously.

First, Plaintiffs allege, "Plaintiff HIFS had contracts with its clients in whom they had agreed to purchase insurance through them from one or more of the State Farm Defendants." (Petition, ¶ 30.). Plaintiffs, however, cannot make such an allegation in good faith because, as the Agent's Agreement makes clear, customers belong to State Farm, and not to individual agents. *See e.g.,* Exhibit A to Motion, ¶ F at p. 2 ("Information regarding names, addresses, and ages of the *customers of the Companies*...are trade secrets and confidential business information *wholly owned by the Companies*...") (emphasis added). A claim for tortious interference is viable only when the interference is done by one who is a *stranger* to the contract or business relationship. *See Ray v. American Nat'l Bank & Trust Co. of Sapulpa,* 894 P.2d 1056, 1060 (Okla. 1994) (tortious interference can only be committed by a stranger to the contract). State Farm was not a stranger but instead was a *party* to the Agent's Agreement, which governed any relationship or

alleged contracts Plaintiffs had with customers – and, under the Agent's Agreement, those customers were State Farm's and not Plaintiffs'. The Agent's Agreement makes clear that Plaintiffs did not have a direct contractual relationship with customers and instead marketed, solicited and serviced insurance products to State Farm customers pursuant to the terms of the Agent's Agreement. Any allegation to the contrary is unavailing in light of the unambiguous language of the Agent's Agreement.

In addition, and as set forth in the Agent's Agreement and recognized by Plaintiffs in the Petition, State Farm was directly involved with State Farm customers as the Companies owned "customer information, property insured identification, expiration or renewal dates of policies, and account and investment information." (Petition, ¶ 18.) Plaintiffs also admit customers "agreed to purchase insurance through them from one or more of the State Farm Defendants." (*Id.*, ¶ 30.) Simply put, it is undisputed any alleged prospective customers would enter a contract to purchase *State Farm* insurance products. (*Id.*) Thus, State Farm could not have tortiously interfered with any such contracts or relationships with State Farm customers. *See, e.g., Davis v. PMA Cos.*, Case No. CIV-11-359-C, 2013 U.S. Dist. LEXIS 31435, *12 (W.D. Okla. March 7, 2013) (citing Oklahoma law for proposition "the [tortious interference] claim is viable only if the interferer is *not a party to the contract or business relationship*" and holding the parent corporation was not a stranger to an employment agreement between plaintiff and employing business entity "given the nature of the contracts and [defendant's] [ownership] … and control over" the employing business entity) (quoting *Wilspec*, 204 P.3d at 74 (emphasis in original)); *C.f., Hammond v. Lyndon Southern Ins. Co.*, Case No. CIV-19-245-D, 2020 U.S. Dist. LEXIS 150156, at *15-16 (W.D. Okla. Aug. 19, 2020) (holding plaintiff's claim that insurance agent tortiously interfered with her

insurance policy failed as a matter of law by virtue of the existing business and contractual relationship between the agent and the insurance company).

Second, Plaintiffs fail to allege facts suggesting that State Farm somehow acted with malice when it purportedly "unilaterally, intentionally and without cause, moved, transferred, and in other ways improperly pulled clients from Plaintiff HIFS's Agency and placed the same with different State Farm agents/agencies." (Petition, ¶ 33.) Plaintiffs' allegations are further devoid of any information describing the number of contracts/relationships at issue, the relevant time of any alleged tortious interference, or any other facts demonstrating malice or wrongfulness Moreover, as a matter of law, State Farm could not have acted "with malice" when the alleged acts involve moving its own customers. Also, even assuming *arguendo* State Farm took "malicious" action with its own customers beyond what is permissible under the Agent's Agreement, Plaintiffs would have a breach of contract claim – not a tortious interference claim.[5]

Accordingly, because Plaintiffs have failed to plead the essential elements of their tortious interference with contract/business relations claim, the Court should dismiss the claim.

**B.    Plaintiffs' Tortious Interference with Prospective Economic Advantage Claim Likewise Fails.**

Plaintiffs' Petition also fails to sufficiently state a claim for tortious interference with prospective economic advantage. Plaintiffs allege they, "had an expectation of business

---

[5] Indeed, Plaintiffs allege State Farm breached the Agent's Agreement by, "taking, moving and transferring clients and customers of Plaintiff HIFS's Agency to other State Farm agencies without justification." (Petition, ¶ 27.) While State Farm denies Plaintiffs' claim for breach of contract as alleged in the Petition, State Farm is not moving to dismiss this claim at this time. State Farm respectfully directs the Court to State Farm's Answer, filed the same day as this Motion for Partial Dismissal.

continuation through established clients and prospective economic opportunities through securing and serving future clients." (Petition, ¶ 43.) Plaintiffs also allege that State Farm "purposefully interfered with and disrupted Plaintiff HIFS's prospective economic business advantage because State Farm financially profits by terminating agents..." (*Id.*, ¶ 46.).

To survive a motion to dismiss on a claim for tortious interference with prospective economic advantage, Plaintiffs must show "(1) the existence of a valid business relation or expectancy; (2) knowledge of the relationship or expectancy on the part of the interferer; (3) an intentional interference inducing or causing a breach or termination of the relationship or expectancy; and (4) resultant damage to the party whose relationship has been disrupted." *Craig Pc Sales & Serv.,* 2018 U.S. Dist. LEXIS 239280, at *25. Plaintiff must specifically allege the interference was the "***purpose*** of the tortfeasor's act, and their motive...include[s] a desire to interfere and disrupt the others' prospective economic business advantage." *Loven v. Church Mut. Ins. Co.,* 452 P.3d 418, 426 (Okla. 2019) (emphasis added). In other words, a tortious interference with prospective economic advantage claim "requires a showing of bad faith." *Id.* at 420.

As a preliminary matter, Plaintiffs ignore State Farm's "right to terminate this [Agent's] Agreement ***at any time with or without reason***." (Ex. A. to Motion, at 3-4) (emphasis added). Simply put, Plaintiffs had no valid expectancy of prospective economic advantage from State Farm customers because the Agent's Agreement could end at any time. Moreover, as discussed in more detail above, State Farm cannot unlawfully interfere with its own business relationship with Plaintiffs or in its business relationships with State Farm customers.

Plaintiffs have also failed to allege State Farm improperly acted for the ***sole*** purpose of intentionally interfering with their prospective economic business advantage (which, as explained

above, Plaintiffs could not have had by virtue of the at-will nature of the Agent's Agreement). Again, it is undisputed any alleged prospective customers would enter a contract to purchase *State Farm* insurance products. (Petition, ¶ 30.) It is also alleged by Plaintiffs that State Farm breached the Agent Agreement "by requiring Plaintiff HIFS to follow and comply with State Farm procedures and processes," essentially conceding that Plaintiffs did not. (Petition, ¶ 16.) Thus, to the extent State Farm allegedly discouraged prospective State Farm customers from purchasing State Farm insurance products through Plaintiffs, it is at least equally plausible State Farm – out of concern that Plaintiffs was not following applicable law and not following State Farm's procedures and processes – acted to protect its own and its customers' economic interests. *See Med. Diagnostic Labs., LLC v. Health Care Serv. Corp.,* No. 17-6189, 772 F. App'x 637, 641 (10th Cir. 2019) ("Oklahoma law holds that an actor's course of conduct is privileged if its 'primary focus' was protection of the actor's legitimate economic interest rather than interference."). Both Plaintiffs and State Farm were beneficiaries of any relationships – prospective or otherwise – that Plaintiffs may have had with State Farm customers. Thus, under the same principles applicable to tortious interference with contract/business relations, State Farm as a matter of law could not have interfered with Plaintiffs' "prospective" interests involving State Farm's customers. Accordingly, Plaintiffs' claim for tortious interference with prospective economic advantage should be dismissed.

**C.    Plaintiffs' Defamation Claim Against State Farm Should Also be Dismissed as a Matter of Law.**

In the Petition, Plaintiffs allege State Farm "made numerous false and defamatory statements to third parties about Plaintiff Humphrey." (Petition, ¶ 53.) Plaintiffs specifically claim



State Farm "notified other insurance carriers that Plaintiff Humphrey 'imputed inaccurate information and failed to supervise team members related to the auto application process.'" (*Id.*). To state a claim for defamation against State Farm, Plaintiffs must establish: (1) a false and defamatory statement concerning Plaintiff Humphrey; (2) an unprivileged publication to a third party; (3) fault by State Farm amounting at least to negligence; and (4) either the actionability of the statement irrespective of special damages, or the existence of special damages caused by the publication. *Sturgeon v. Retherford Publs, Inc.*, 987 P.2d 1218, 1223 (Okla. Civ. App. 1999). As discussed below, Plaintiffs' allegations are inconsistent regarding the truthfulness of State Farm's alleged defamatory statements and are insufficiently detailed to state a claim for defamation.

A defendant accused of defamation may, "[a]s a defense thereto…prove that the matter charged as defamatory was true." 12 Okla. St. § 1444.1 (2021). Plaintiffs' Petition alleges State Farm "intended to audit [Humphrey] and one of her team members' quote activity from 2018 and 2019." (Petition, ¶ 58.) The Petition further admits Humphrey accepted blame, in writing, for "ghost quoting," which "resulted in multiple credit reports being run on the potential leads." (*Id.*, ¶¶ 59-61.) Plaintiffs' allegations that State Farm breached the Agent Agreement "by requiring Plaintiff HIFS to follow and comply with State Farm procedures and processes," also essentially admits that Plaintiffs did not comply with said procedures and processes. (*Id.*, ¶ 16.) Plaintiffs, based on their own allegations, concede State Farm audited HIFS, Humphrey admitted to wrongdoing, and Plaintiffs resisted compliance with State Farm's procedures and processes. Thus, any defamation claim based on State Farm's purported statements to other insurance carriers regarding termination of Plaintiffs' Agent's Agreement for issues complying with State Farm procedures and processes is ***not*** actionable. *C.f. In re Amendments to the Okla. Unif. Jury*

{S569724;}                                    10

*Instructions – Civ. (Second)*, 2014 OK 17, Instruction No. 28.3 (2014) ("[M]inor inaccuracies do not amount to falsity if the statement is substantially true…"); *Grogan v. KOKH, LLC*, 256 P.3d 1021, 1027-1028 (Okla. Civ. App. 2011) (upholding dismissal of plaintiff's defamation claim because the broadcast's report that parents accused the plaintiff of threatening to shoot students was true and whether the plaintiff did or did not threaten students was ultimately immaterial).

Plaintiffs' defamation claim also should be dismissed in its entirety because the Petition fails to sufficiently allege State Farm's alleged statements were unprivileged communications to a third party. State Farm's purported notice to other insurance carriers of potential wrongdoing by Plaintiffs does not support Plaintiffs' claim for defamation because, assuming *arguendo* that any such notice was provided, it would be a privileged statement under Oklahoma law.[6]  Specifically, State Farm's alleged disclosure regarding Plaintiffs' conduct involved "information that affected an important interest of [other insurance carriers]," and was a statement made to a prospective principal in a principal/agent relationship with Plaintiffs. *See In re Amendments to the Okla. Unif. Jury Instructions – Civ. (Second)*, 2014 OK 17, Instruction No. 28.8 (2014); *see also Fawcett*

---

[6] Presumably Plaintiffs' allegation in Petition ¶ 53 refers to a mandatory report submitted by State Farm to the Oklahoma Department of Insurance, although the language quoted in paragraph 53 does not appear in the report. State Farm denies any allegation it discussed Plaintiff Humphrey with other insurance carriers, and the Petition is impermissibly vague in that regard as Plaintiff fails to identify any such carriers. Moreover, State Farm's communication to the Oklahoma Department of Insurance would also be considered a privileged statement and cannot form the basis of a defamation claim. *See* 36 Okla. St. § 363(B) (2021) ("No insurer, employee or agent of an insurer, or any other person acting in the absence of fraud, bad faith, reckless disregard for the truth, or actual malice shall be subject to civil liability for libel, slander or any other relevant tort or subject to criminal prosecution by virtue of filing of reports or furnishing other information either orally or in writing, concerning suspected, anticipated or completed fraudulent insurance acts to the Anti-Fraud Division of the Insurance Department or the Workers' Compensation and Insurance Fraud Unit of the Office of the Attorney General pursuant to subsection A of this section or to any other agency involved in the investigation or prosecution of suspected insurance fraud.")

*Publications, Inc. v. Morris*, 377 P.2d 42, 52 (Okla. 1962) (holding as a general rule a qualified

privilege applies in cases where "some special private relationship has been involved, such as

fraternal, fiduciary, business, or professional"); *Thornton v. Holdenville General Hosp.*, 36 P.3d

456, 461 (Okla. Civ. App. 2001) ("A conditional privilege attaches to statements, which would

ordinarily be defamatory, made in good faith on a subject in which the speaker has an interest or

in reference to which he has or honestly believes he has a duty to perform."); *C.f. Restatement*

*(Second) of Torts* § 595, comment i (1977) ("Under many circumstances, a former employer of a

servant is conditionally privileged to make a defamatory communication about the character or

conduct of the servant to a present or prospective employer" if the statements were "made for the

purpose of enabling that person to protect his own interests and they must be reasonably calculated

to do so.").

Moreover, Plaintiffs' Petition is devoid of any details regarding the identity of the alleged

State Farm personnel who made defamatory statements to unnamed insurance carriers. Plaintiffs

therefore fail to allege State Farm authorized any individuals under its control to make such

statements or that State Farm personnel made defamatory statements within the scope of their

employment. The Petition also lacks any information as to publication of the alleged defamatory

statements (*i.e.*, whether the communications were oral or written). Therefore, for this reason and

the reasons described above, Plaintiffs have failed to sufficiently allege the elements of their

defamation claim, and this Court should dismiss the claim. *See, e.g., Lockhart v. Loosen*, 943 P.2d

1074, 1078 (Okla. 1997) ("Under most circumstances a plaintiff's petition is…dismissible…for

insufficient facts under the advanced theory.").

**D.    Plaintiffs' Constructive Fraud/Negligent Representation Claim Should Be**

Dismissed.

Plaintiffs' Petition alleges Defendant Holley, an employee of State Farm, "had a duty to exercise reasonable diligence and skill in training Plaintiff Humphrey on her job duties at State Farm...[and] had a duty[7] to accurately answer all of Plaintiff Humphrey's questions and provide proper advice about the State Farm audit..." (Petition, ¶ 58, 62.) Plaintiffs' further allege Defendant Holley advised Humphrey to "say how she understood that she should have been more aware of consumer report generation activity, and that she had created a plan to monitor new reports daily, etc...[and] assured Plaintiff Humphrey that she was not in jeopardy." (*Id.,* ¶ 59.) Following Holley's alleged advice, "Plaintiff Humphrey responded to the State Farm audit in writing...and took all the blame and did not identify the fact that Defendant Holley is the person who trained her and her team members how to ghost quote potential leads." (*Id.,* ¶ 61.) Plaintiffs now claim, "Defendant Holley breached [his] duty by misrepresenting and/or concealing pertinent material facts to Plaintiff Humphrey relating to her response to State Farm's audit." (*Id.,* ¶ 63.)

Plaintiffs' negligent misrepresentation/constructive fraud claim against Defendant Holley fails, however, because any alleged damages were caused by her own admitted misconduct.[8] Plaintiffs allege, "Defendant Holley told Plaintiff Humphrey how to respond to State Farm's audit in writing ... and that State Farm was trying to scare her and that they would never terminate an agent unless they were previously warned and failed to cease the activity corporate wanted them to stop." Petition ¶ 59. Thus, Humphrey admits to the improper activity that led to the termination

---

[7] State Farm does not concede Holley had various legal "duties" to Humphrey as alleged in the Petition.

[8] State Farm reserves the right to raise additional arguments in support of dismissing Plaintiffs' claim against Holley.

of her Agent's Agreement but contends Holley should have told her to lie or at least not "take all blame" for any alleged failures to follow State Farm procedures. *Id.*    As alleged, Humphrey's damages were caused by her decision to engage in improper activity and her subsequent decision to tell auditors the truth about it,[9] and the Court should not accept an argument that Defendant Holley was the cause of any such alleged damages.    Accordingly, Plaintiffs' claim against Defendant Holley should be dismissed for failure to state a claim because Defendant Holley did not cause Plaintiffs' alleged damages and no cause of action exists for breach of a "duty" to advise someone to lie. To the extent this claim is asserted against State Farm, it should likewise be dismissed.

## IV.    CONCLUSION

For all the foregoing reasons, Plaintiffs' claims against State Farm for interference with contract/business relations and interference with prospective economic advantage, and Plaintiffs' claim against Defendant Holley for negligent misrepresentation/constructive fraud should be dismissed in their entireties, *with prejudice*, for failure to state a plausible legal claim under Section 2012(B)(6) and for their inability to be cured by subsequent amendment to the Petition. Plaintiffs' claim for defamation, based on the arguments above, should also be dismissed in its entirety, *with prejudice*. If not, and at a minimum, Plaintiffs should be required to sufficiently plead the elements of that claim and to plead facts in support of those elements.

WHEREFORE, State Farm respectfully requests that the Court grant State Farm's Motion for Partial Dismissal.

---

[9] Alternately, if Plaintiff is alleging she purposefully lied to the auditors – whether or not based on Holley's advice – her claim likewise should be denied.

Respectfully submitted, this 17th day of May, 2021.

*Lance E. Leffel*

Lance E. Leffel, OBA #19511
GABLEGOTWALS
One Leadership Square, 15th Floor
211 North Robinson
Oklahoma City, OK 73102-7255
lleffel@gablelaw.com
Telephone:  405.235.5500
Facsimile:   405.235.2875

*and*

David A. Hughes
Georgia Bar No. 375618
Lauren F. Gordon
Georgia Bar No. 557058
JACKSON LEWIS P.C.
171 17th Street, NW, Suite 1200
Atlanta, Georgia 30363
Telephone: (404) 525-8200
Facsimile: (404) 525-1173
David.Hughes@jacksonlewis.com
Lauren.Gordon@jacksonlewis.com

ATTORNEYS FOR STATE FARM

## IN THE DISTRICT COURT OF CANADIAN COUNTY
## STATE OF OKLAHOMA

| | | |
|---|---|---|
| HUMPHREY INSURANCE AND FINANCIAL SERVICES, INC., an Oklahoma corporation; and COURTNEY HUMPHREY, an Individual, | ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | Case No. CJ-2021-140 |
| STATE FARM MUTUAL AUTOMOBILE INS. CO.; STATE FARM LIFE INSURANCE CO.; STATE FARM FIRE AND CASUALTY CO.; STATE FARM GENERAL INSURANCE CO., a collection of foreign insurance companies; and CLARENCE HOLLEY, an individual, | ) ) ) ) ) ) ) | |
| Defendants. | ) ) | |

## CERTIFICATE OF SERVICE

I hereby certify that, on May 17, 2021, I filed the foregoing **DEFENDANT STATE FARM'S MOTION FOR PARTIAL DISMISSAL AND INCORPORATED MEMORANDUM OF LAW** with the Clerk of Court, and served a copy of same via First Class U.S. Mail to all counsel of record.

*Lance E. Leffel*
Lance E. Leffel, OBA #19511

36-2541
Form AA05 (INC)

# STATE FARM AGENT'S AGREEMENT

STATE FARM MUTUAL AUTOMOBILE INSURANCE COMPANY, STATE FARM LIFE INSURANCE COMPANY, STATE FARM FIRE AND CASUALTY COMPANY, and STATE FARM GENERAL INSURANCE COMPANY, collectively referred to in this Agreement as "we," "us," "State Farm," or "the Companies," insurance corporations organized and existing under the laws of the State of Illinois, with their principal offices located at Bloomington, Illinois, appoint Humphrey Insurance and Financial Services Inc, a corporation organized and existing under the laws of the State of Oklahoma, with its office located at Edmond, Oklahoma, referred to in this Agreement as "the Agent," to represent the Companies in Oklahoma, while properly licensed so to act, in accordance with the provisions of this Agreement. Courtney R Humphrey shall be the President of the Agent and is referred to in this Agreement as "the President" and the President shall be the chief executive officer of the Agent. Schedules of Payments Forms applicable to this AA05 INC and the respective company as indicated hereto attached, constitute a part of this Agreement. This Agreement is to become effective December 01, 2018, and shall continue until terminated as herein provided.

## PURPOSE

The purpose of this Agreement is to set forth the objectives, obligations, and responsibilities essential to the relationship between the Agent, its officers and employees, the President and State Farm. It is to our mutual interest to serve the insuring and investing public, to comply with all applicable laws, including maintaining applicable licenses for all products State Farm offers, to increase business on a profitable basis, and to maintain the Companies financial strength to protect customers' interests.

The Companies' agents operating as independent contractors, within the scope of their authority, are best able to provide the creative solicitation, professional counseling, and prompt and skillful service essential to the creation and maintenance of successful multiple-line Companies and agencies. We do not seek, and will not assert, control of Agent's officers' or licensed sales representatives', or the President's daily activities, but expect them to exercise their own judgment as to the time, place, and manner of soliciting insurance, servicing customers, and otherwise carrying out the provisions of this Agreement.

State Farm makes available to the Agent's officers and licensed sales representatives the experience and technical knowledge acquired and developed over the years with respect to soliciting, underwriting, and servicing insurance and financial service products. We will provide the Agent, through our personnel, with information and guidance as to the operation, conduct, and financial management of the agency; and from time to time we will designate specific employees to offer advice to the Agent's officers and licensed sales representatives on the activities of the Agent. The President will be invited to attend meetings for the purpose of introducing new products, ideas, services and procedures, promoting sales, and furnishing the Agent with assistance, guidance, and consultation.

The Companies and the Agent expect that by entering into this Agreement, and by the full and faithful observance and performance of the obligations and responsibilities herein set forth, a mutually satisfactory relationship will be established and maintained.

To these ends, the Companies and the Agent and the President agree:

## SECTION I - OBLIGATIONS

A.  The Agent will solicit applications for insurance and financial services, collect premiums, fees and charges,


EXHIBIT
A

DocuSign Envelope ID: 5E3FB272-D3EA-4495-●-●C-16759267B3F5

countersign and deliver policies, reinstate and transfer insurance, assist customers, and cooperate with Company representatives in reporting and handling claims.

B.  This is a Principal-Agent relationship.  As a State Farm agent, the Agent's obligations and duties include, but are not limited to, following State Farm procedures and processes, providing prompt, friendly, accurate, and cost effective service, avoiding conflicts of interest, cooperating with and advancing the interests of the Companies, the agents, the policyholders and the customers.  The President shall also have obligations and duties to State Farm, including but not limited to, following State Farm procedures and processes, providing prompt, friendly, accurate, and cost effective service, avoiding conflicts of interest, cooperating with and advancing the interests of the Companies, the agents, the policyholders and the customers.

C.  The officers and licensed sales representatives of the Agent and the President have full control of their daily activities, with the right to exercise independent judgment as to time, place, and manner of offering financial services, soliciting insurance, servicing customers, and otherwise carrying out the provisions of this Agreement.

D.  Insurance and financial services are closely regulated businesses.  The Agent and the President must deal appropriately with policyholders and customers in all transactions, be trustworthy in handling money, avoid false advertising and unfair practices, and otherwise comply with all laws and regulations.  As part of the Agent's obligations under this agreement, State Farm will require the President to attend an annual compliance or ethics related training program conducted or approved by State Farm.

E.  State Farm will furnish the Agent, without charge, manuals, forms, records, computer-related and electronic files, equipment, and such other materials, supplies, and services as we may specify from time to time.  All such property furnished by us shall remain the property of the Companies.  In addition, State Farm will offer at the Agent's expense additional equipment, materials, supplies and services.

F.  Information regarding names, addresses, and ages of customers of the Companies; the description and location of insured property; expiration or renewal dates of State Farm policies, and account and investment information acquired or coming into the Agent's possession during the effective period of this Agreement, or any prior Agreement, except information and records of policyholders insured through any governmental or insurance industry plan or facility, are trade secrets and confidential business information wholly owned by the Companies.  All forms, computer-related and electronic files, and other materials, whether furnished by State Farm or purchased by the Agent, upon which this information is recorded shall be the sole and exclusive property of the Companies.  The Agent's possession of this information is only for use in carrying out the duties and responsibilities under this Agreement.  The Agent and the President shall take all reasonable steps to maintain the value and confidentiality of such information, including informing the Agent's officers, employees, and licensed sales representatives of this responsibility, and assuring their compliance.

G.  The expense of any office, including rental, furniture, and equipment; signs; supplies not furnished by us; the compensation of the Agent's employees; telephone; postage; advertising; and all other charges or expense incurred by the Agent in the performance of this Agreement shall be incurred at the Agent's discretion and paid by the Agent.  The Agent agrees that in the location or relocation of its office there will be no undue infringement on the established office location of any other agent.  The Agent agrees not to make any commitment to change office location without reasonable, at least 30 days, prior written notice to the Companies or establish any office in addition to the Agent's principal office without the prior approval of the Companies.

H.  We will advertise, provide promotional materials, and participate in the cost of the Agent's advertising, in accordance with policies determined from time to time by us.  The Agent will not use any advertisements referring to us or identifying us, directly or indirectly, without our prior approval.

I.  The President of the Agent shall be a licensed sales representative of the Agent.  The President of the Agent shall also be licensed in all locations where the Agent is licensed and in all locations where the Agent conducts business.  The fulfillment of this Agreement will be the Agent's principal business and the President's principal occupation and requires the President's personal services.  Neither the Agent, the President, nor any licensed sales representative of the Agent will directly or indirectly offer financial services or write or service insurance for any other company, other than a State Farm subsidiary or affiliate or through any governmental or insurance industry plan or facility, or for any agent or broker, except in accordance with the terms of any written consent we may give the Agent.

J.  We will leave in the Agent's account all policies and

financial services accounts credited to thereto so long as the customer resides within a 75-mile radius of the Agent's principal place of business and within a State in which the Agent is duly licensed, except that we may, after prior written notice to the Agent, transfer any policy or account to the account of another State Farm agent when the customer makes a bona fide request in writing. The Agent and the President will respect the rights and interests of other agents in policies and accounts credited to them by refraining from raiding or otherwise diverting policies or accounts from them. The Agent and the President shall neither directly nor indirectly attempt to divert policies or accounts from unassigned accounts or from those of other State Farm agents, or the Agent's own account to the accounts of other State Farm agents.

K. All funds collected on behalf of the Companies shall be held in trust by the Agent as the absolute property of the Companies, and the Agent will be responsible for these funds until they are safely transmitted to the Companies. The Agent agrees to maintain a premium fund account for State Farm's benefit in a bank or similar financial institution, which we may audit at any time, in which the Agent will promptly deposit all funds collected for State Farm premiums, fees or charges. The Agent further agrees to transmit all such funds and all insurance applications promptly as directed by State Farm.

L. Any amount (exclusive of premiums due on policies issued to the Agent and the President) at any time owing by the Agent or President to any of the Companies, their subsidiaries and affiliates, shall be a first lien on any payment due or thereafter becoming due the Agent under any of the provisions of this Agreement, and the Companies are authorized to deduct such indebtedness from any such payment due or thereafter becoming due to the Agent from the Companies.

M. If any application or account is rejected or any policy is surrendered or canceled, in whole or in part, for any reason, before the expiration of the policy period, or if any premium is reduced or an overpayment made to the Agent, the compensation paid to the Agent on the amount returned or credited to the policyholder or the amount overpaid to the Agent shall be charged to the Agent and shall constitute an indebtedness of the Agent to the Companies.

N. We retain the right to prescribe: all accounts and policy forms and provisions; premiums, fees, and charges for insurance and financial services; rules governing the binding, acceptance, renewal, rejection, or cancellation of risks, and adjustment and payment of losses; and limitations on the submission of applications by individual agent, by market area, by line of coverage, by policy type, by account type, by Company, or by other means.

O. Neither the Agent nor the President will represent themselves as having any powers except those authorized by this Agreement and subject to any applicable law. Without limiting the foregoing, neither the Agent nor the President shall have the authority to extend the time of payment of any premium, or to alter, waive, or forfeit any of the Companies' rights, requirements, or conditions in any policy of insurance, or otherwise obligate the Companies in any way except as stated in this Agreement or expressly authorized under the rules and regulations of the Companies or as otherwise authorized in writing by the Companies.

P. The Agent is responsible for the recruitment, selection, compensation, management, and control of the Agent's employees. The Agent is responsible for the employee's activities and ensuring that all employees are properly licensed and authorized for the activities they undertake on the Agent's behalf. The Agent's employees must obtain proper authorization from each Company prior to binding risk or incurring liability on behalf of each Company. Each Company reserves the right to fix and determine procedures for obtaining and maintaining proper authorization for the Agent's employees.

## SECTION II - COMPENSATION

A. Each Company will make payments to the Agent as set forth in the applicable Schedule of Payments.

B. State Farm will maintain life insurance in the amount of $100,000 on the life of the President, payable to the beneficiary selected by the Agent, so long as this Agreement has not been terminated and the President has not attained age 70.

C. STATE FARM MUTUAL AUTOMOBILE INSURANCE COMPANY, STATE FARM FIRE AND CASUALTY COMPANY, and STATE FARM GENERAL INSURANCE COMPANY will make additional compensation payments to the Agent under any applicable schedule based on the Agent's achievement of standards of quality of agency operation, or insurance production.

D. Each Company reserves the right to fix and determine the amount, extent, and conditions of any bonuses, awards, prizes, and allowances.

## SECTION III - TERMINATION OF

DocuSign Envelope ID: 5E3FB272-D3EA-4495-■■■C-16759267B3F5

## AGREEMENT

A. This Agreement will terminate upon the death of the President. The Agreement will also terminate upon any change of the identity of the President or if the President's ownership interest of the Agent falls below 51 percent. Either the Agent or State Farm have the right to terminate this Agreement at any time with or without reason by providing written notice delivered to the other or mailed to the other's last known address. The date of termination shall be the date specified in the notice, but in the event no date is specified, the date of termination shall be the date of delivery if the notice is delivered, or the date of the postmark, if the notice is mailed. Either the Agent or State Farm can accelerate the date of termination specified by the other by giving written notice of termination in accordance with this paragraph.

B. After termination of this Agreement the Agent and President agree not to act or represent themselves in any way as an agent or representative of the Companies.

C. Within ten days after the termination of this Agreement, all property belonging to the Companies shall be returned or made available for return to the Companies or their authorized representative.

D. For a period of one year following termination of this Agreement, the Agent and the President will not either personally or through any other person, agency, or organization solicit any customer credited to the Agent's account at the date of termination to purchase any insurance coverage or financial services product competitive or comparable with the insurance coverages or products sold or offered by the Companies. In the event the "period of one year" conflicts with any statutory provision, such period shall be the period permitted by statute.

## SECTION IV - ANNUAL INVESTMENT PROGRAM

To assist the Agent in investing for the period following termination of this agreement, the applicable Companies will make annual investment payments directly to the Agent as set forth below:

A. After the President is a licensed agent for the Companies, or a licensed sales representative of the Agent for sixty (60) months either under this Agreement or any combination of this Agreement and a prior State Farm Agent's Agreement or Local Agent's Appointment, and for so long as this

Agreement is in force and for up to two hundred forty (240) calendar months, STATE FARM MUTUAL AUTOMOBILE INSURANCE COMPANY, STATE FARM FIRE AND CASUALTY COMPANY, and STATE FARM GENERAL INSURANCE COMPANY will pay the Agent an annual investment payment.

B. Beginning with the month after the Agent or President has qualified pursuant to IV.A. above and continuing until the earlier of the month in which this Agreement terminates or the maximum of two hundred forty (240) calendar months is reached, an annual investment payment will be made within a reasonable period after the end of each calendar year. The amount of each Company's payment will be five percent (5%) of production earnings paid the Agent by that Company in the applicable months of the prior year.

C. For purposes of determining the amount of any annual investment payment, the "production earnings" paid shall include:

1. compensation provided in applicable Schedules of Payment for policies of State Farm Mutual Automobile Insurance Company, including health insurance policies, other than compensation as described in Section II.A. of the Schedules;

2. compensation provided in applicable Schedules of Payment for policies of State Farm Fire and Casualty Company and State Farm General Insurance Company, other than compensation as described in Section II.A. of the Schedules;

3. any compensation provided by a Schedule of Compensation as described in Section II. C.; and

4. any Legion of Honor bonus, regional production bonus, or other incentive compensation designated for inclusion in "production earnings" from time to time in the publication of the Companies' Annual Agency Programs.

## SECTION V - TERMINATION PAYMENTS

In the event this Agreement is terminated, the STATE FARM LIFE INSURANCE COMPANY will pay the Agent,

A. On business written by the Agent under the applicable Life Schedule of Payments:

1. any remaining writing compensation for the first through fifth policy years as would have been due and payable to the Agent if this Agreement had

not been terminated; and

2. if on the date of termination the President has been a licensed agent for the Companies, or a licensed sales representative of the Agent for five (5) or more years of combined service as an agent under this Agreement and any prior State Farm Agent's Agreement or Local Agent's Appointment, any remaining writing compensation for the sixth through fifteenth policy years as would have been due and payable to the Agent if this Agreement had not been terminated; and

B. If on the date of termination the President has been a licensed agent for the Companies, or a licensed sales representative of the Agent for twenty five (25) or more years of combined service as an agent under this Agreement and any prior State Farm Agent's Agreement or Local Agent's Appointment, on business then credited to the Agent's account on which service compensation is being paid the Agent,,

1. on traditional ordinary policies on which the Agent's service compensation rate is three percent (3%), a monthly amount equal to two percent (2%) of one-twelfth (1/12) of the annualized premium of any such policy;

2. on traditional ordinary policies on which the Agent's service compensation rate is two percent (2%), a monthly amount equal to one and one-half percent (1 1/2%) of one-twelfth (1/12) of the annualized premium of any such policy;

3. on Flexible Premium Retirement or Deferred Life Annuity policies, a monthly amount equal to three-fourths of one percent (3/4 of 1%) of an average monthly premium of any such policy; and

4. on Universal Life or Second to Die policies, a monthly amount equal to one and one-half percent (1 1/2%) of an average monthly premium of any such policy

beginning the last day of the month following the month in which you separate from service with State Farm and until the last day of the month in which the Presidents death occurs; except that no amount shall be paid on any policy made available for assignment by the termination of an agreement between the Company and an agent or by a release of policies pursuant to the applicable paragraph of Section IV of another State Farm Agent's Agreement, and except that if the President were less than sixty five (65) years of age on the date of termination of this Agreement, amounts shall be reduced actuarially based on the President's lower age.

C. The "average monthly premium" of a policy shall be calculated by dividing the total premium paid on the policy by the number of full months elapsing between its Policy Date and termination of this Agreement, except that the "average monthly premium" for a policy in force less than sixty (60) months shall be no greater than:

1. for a Universal Life policy or Second to Die policy, one-twelfth (1/12) of the total Primary Compensation Premium paid on the base policy and any increases to base and added riders, and

2. for a Deferred Life Annuity policy, two hundred dollars ($200).

D. The "annualized premium" of a policy shall be the amount of the premium payment of the policy multiplied by the number of payments per policy year for the premium payment mode applicable when this Agreement is terminated.

E. At any time the Company owes for each of three (3) consecutive periodic payments in this Section, less than one hundred dollars ($100), the Company may, in its sole discretion, make a single sum payment of the present value of such future amounts. The payment amount shall reasonably consider the time value of money and any influence of policy persistency, agent mortality, and other factors relevant to the payment frequency and amounts otherwise provided herein. If the present value exceeds the limit set forth in Internal Revenue Code Section 402(g), periodic payments will continue.

F. The new Deferred Annuity and the new Single Premium Immediate Annuity with Choice of Certain Period are not eligible for Termination Payments.

### SECTION VI –GENERAL PROVISIONS

A. This Agreement has been entered into by the Companies with the Agent and the President in reliance upon the representations and agreements that:

   1. The identity of the President will not change.

   2. The President participates in the ownership of the Agent with a 51 percent or greater ownership interest.

   3. The President shall be the chief executive officer of the Agent and shall have full managerial authority and responsibility for the operating management of the Agent as provided in the Agent's bylaws.

B. Since State Farm is relying on the Agent and the President to carry out the provisions of this Agreement,  neither the Agreement nor any interest thereunder can be sold, assigned, or pledged by the Agent or the President; and no right in any sum due or to become due to the Agent hereunder can be sold, assigned, or pledged without prior written consent of the Companies.

C. Each Company shall be bound by all terms of this Agreement, except that the separate Schedules of Payments hereto attached, and those other provisions where the express language or context indicates that they are applicable to a particular Company only, shall be applicable to the individual Company only; and the rights and duties of the Agent with respect to each

Company shall be governed accordingly.

D. The President in his/her individual capacity shall be bound by all terms of this Agreement.

E. All payments for termination which otherwise might have become payable to the Agent or the President under the terms of prior agreements with any of the Companies are hereby waived by the Agent and the President.

F. This Agreement supersedes all prior commitments, inducements, promises, negotiations, representations, obligations, conditions, or agreements, oral or written, between State Farm, its representatives, the Agent and the President, except with respect to compensation owing the Agent under Schedules of Payments under the Agent's immediate preceding State Farm Agent's Agreement, if any, and with respect to compensation overpayments or any other amounts the Agent owes State Farm.

G. This Agreement constitutes the sole and entire Agreement between the parties hereto, and no change, alteration, or modification of the terms of this Agreement may be made except by agreement in writing signed by an authorized representative of the companies and accepted by the Agent and the President.

DocuSign Envelope ID: 5E3FB272-D3EA-4494-...0C-16759267B3F5

36-2541
Form AA05 (INC)

WHEREOF, the Companies have caused this Agreement to be executed on their behalf by their authorized representative, to be effective on the date above set out at the beginning of the contract hereof, upon its acceptance in writing by the Agent.

STATE FARM MUTUAL AUTOMOBILE INSURANCE COMPANY
STATE FARM LIFE INSURANCE COMPANY
STATE FARM FIRE AND CASUALTY COMPANY
STATE FARM GENERAL INSURANCE COMPANY

By: _Brian Maxwell_
Authorized Representative (signature)

WHEREOF, I hereby execute State Farm Agent Agreement Form AA05 (INC), dated December 01, 2018, and attached Schedules of Payments Forms applicable to AA05 (INC) and the respective Company as indicated, constituting the entire agreement by each Company as set forth therein all of which I hereby acknowledge that I have read and understand.

Humphrey Insurance and Financial Services Inc
Name of Corporation

By: _Courtney R Humphrey_
President (signature)

WHEREOF, I hereby execute State Farm Agent Agreement Form AA05 (INC), dated December 01, 2018, and attached Schedules of Payments Forms applicable to AA05 (INC) and the respective Company as indicated, constituting the entire agreement by each Company as set forth therein all of which I hereby acknowledge that I have read and understand.

By: _Courtney R Humphrey_
Individually (signature)

Replaces-None
07-01-2013

Printed in U.S.A.

No *Shepard's* Signal™
As of: May 3, 2021 2:07 PM Z

# Mays v. Liberty Mut. Fire Ins. Co.

United States District Court for the Western District of Oklahoma

October 21, 2016, Decided; October 21, 2016, Filed

Case No. CIV-16-996-F

**Reporter**
2016 U.S. Dist. LEXIS 202280 *

RICHARD MAYS and SHERI MAYS, Individuals; and MAYS SERVICE, INC., an Oklahoma corporation, Plaintiffs, -vs- LIBERTY MUTUAL FIRE INSURANCE COMPANY, Defendant.

## Core Terms

plaintiffs's, breach of contract claim, statute of limitations, one-year, tolling, bad faith claim, allegations, repairs, contractual limitations period, individual plaintiff, limitations period, insurance policy, two year, time-barred, invoices

**Counsel:** **[*1]** For Liberty Mutual Fire Insurance Co, Defendant: Jerrick L Irby, ATTORNEY TO BE NOTICED, Hall Estill-TULSA, Tulsa OK; William W O'Connor, LEAD ATTORNEY, Hall Estill-TULSA, Tulsa OK; Margo E Shipley, LEAD ATTORNEY, Hall Estill-TULSA, Tulsa OK; Keith A Wilkes, ATTORNEY TO BE NOTICED, Hall Estill-TULSA, Tulsa OK.

For Mays Service Inc, Richard Mays, Individual, Sheri Mays, Individual, Plaintiffs: Dan M Peters, ATTORNEY TO BE NOTICED, Woska & Swim, Oklahoma City OK; Rachel L Mor, LEAD ATTORNEY, Rachel Lawrence Mor Attorney at Law, Oklahoma City OK; Charles W Wright, ATTORNEY TO BE NOTICED, Haupt Brooks Vandruff PLLC, Oklahoma City OK.

**Judges:** STEPHEN P. FRIOT, UNITED STATES DISTRICT JUDGE.

**Opinion by:** STEPHEN P. FRIOT

## Opinion

**ORDER**

Before the court is Defendant Liberty Mutual Fire Insurance Company's Motion to Dismiss, filed September 6, 2016. Doc. no. 5. The motion challenges the sufficiency of plaintiff's petition under Rule 12(b)(6), Fed.R.Civ.P. Plaintiffs have responded to the motion and defendant has replied. Upon due consideration of the parties' submissions, the court makes its determination.

I.

This action was originally commenced in the District Court for Cleveland County, State of Oklahoma. Defendants timely removed the action to this court. **[*2]** In their petition, plaintiffs, Richard and Sheri Mays, allege claims against defendant for breach of contract and bad faith. Plaintiff, Mays Services, Inc., alleges a claim against defendant for breach of contract.

According to the petition, the individual plaintiffs's residence was substantially damaged by fire following a lightning strike on or about October 22, 2010. At the time of the fire, the residence was covered by a homeowners residential and general liability insurance policy issued by defendant. On October 26, 2010, defendant sent its adjuster to the residence to inspect the structure and the individual plaintiffs' personal property. Defendant's adjuster submitted a written estimate of costs of repairs to defendant and plaintiffs on or about November 23, 2010. Thereafter, the individual plaintiffs engaged contractors, including plaintiff, Mays Services, Inc., to make the

pursuant to defendant's instructions and in accordance with the adjuster's estimate of cost of repairs. The repairs to the residence continued from December 2010 through March 2012. On or about May 12, 2012, the individual plaintiffs and plaintiff, Mays Services, Inc., submitted invoices for the repairs [*3] covered by the policy and set out in the estimate. The individual plaintiffs also had claims for replacing damaged personal property, for additional living expenses, including rent and utilities, and for other expenses. According to the petition, plaintiffs made timely demand under the policy for payment of all costs and complied with all reasonable demands, but defendant refused to negotiate and pay the claims. Further, on July 5, 2016, plaintiff, Mays Services, Inc., again submitted invoices for labor and services performed at the individual plaintiffs's residence and defendant refused to pay the amounts due and owing.

II.

Defendant seeks to dismiss all claims alleged against it on the grounds that the claims are unsustainable and time-barred under the terms of the applicable insurance policy and the applicable statute of limitations. Defendant contends that as to the individual plaintiffs's breach of contract claim, the insurance policy contained a one-year limitations period which ran from the date of loss, October 22, 2010. Also, defendant asserts that the bad faith claim is barred by the applicable two-year statute of limitations. As to plaintiff, Mays Services, Inc., defendant [*4] asserts that it had no contract with plaintiff and the petition does not allege one, but even if one existed, it would either be barred by the one-year limitation period in the insurance policy or the three-year statute of limitations for oral contracts.

Plaintiffs, in response, contend that there are fact issues regarding tolling of the limitations periods in this case. According to plaintiffs, they should be provided the opportunity to fully develop the facts through discovery. Although defendant asserts in its motion that plaintiffs's file was closed, plaintiffs say they had no idea the file was closed and that plaintiff, Richard Mays, was communicating and negotiating with defendant as recently as the spring of 2016. Plaintiffs also state that defendant never denied any aspect of their claims. Plaintiffs assert that defendant set forth facts in its motion which showed that it engaged in conduct well past the statutory bar.

In reply, defendant argues that the affirmative defense of statute of limitations may be resolved on a motion to dismiss. Defendant maintains that on the face of the

petition, all of plaintiffs' claims are time-barred. In addition, defendants contend that plaintiffs [*5] have the burden to demonstrate a basis for tolling the statute of limitations and they have not met that burden.

III.

The statute of limitations bar is an affirmative defense, which may be resolved on a motion under Rule 12(b)(6), Fed. R. Civ. P., "when the dates given in the complaint make it clear that the right sued upon has been extinguished." Aldrich v. McCulloch Props, Inc., 627 F.2d 1036, 1041 n. 4 (10th Cir. 1980).

The insurance policy at issue provided in pertinent part that "[n]o action can be brought unless the policy provisions have been complied with and the action is started within one year after the date of loss." Ex. 1 to defendant's motion, at p. 10.[1] Plaintiffs concede that their action was filed outside the contractual one-year limitation period. See, plaintiffs's response at p. 5. And it is clear from the allegations of the petition that it was not filed within one year after the date of loss, on or about October 22, 2010. Nonetheless, plaintiffs argue that "there are factual issues regarding tolling of the limitations period and whether Defendant waived its right to enforce the contractual limitations period." Id. However, the petition does not set forth sufficient facts as to the tolling or waiver issues. Therefore, the court finds that the individual plaintiffs' breach [*6] of contract claim is time-barred and subject to dismissal under Rule 12(b)(6). Despite defendant's arguments to the contrary, the court is not convinced that an amendment to the petition would be futile. Therefore, the court shall permit the individual plaintiffs to amend their pleading to set forth factual allegations which would support tolling or waiver of the one-year contractual limitations period for their breach of contract claim.

It appears from plaintiffs' response that plaintiff, Mays Services, Inc.'s breach of contract claim is premised upon third-party beneficiary status. Although defendant, in reply, contends that plaintiff's position is not supported by citation to legal authority, the court cannot say, as a matter of law, that plaintiff, Mays Services, Inc., is precluded from pursuing a breach of contract

---

[1] The court may review the insurance policy without converting defendant's motion into one for summary judgment because the insurance policy is referred to in the petition and is central to plaintiffs' claim. GFF Corp. v. Associated Wholesale Grocers, Inc., 130 F.3d 1381, 1384-85 (10th Cir. 1997). And plaintiffs do not challenge that its authenticity.

claim based upon third-party beneficiary status. Plaintiff, Mays Services, Inc.'s breach of contract claim, however, is time-barred and subject to dismissal under Rule 12(b)(6) since plaintiffs have conceded that their action was filed outside the one-year contractual limitations period. Similar to the individual plaintiffs, the court shall permit plaintiff, Mays Services, Inc., to amend the **[*7]** petition to set forth factual allegations which support tolling or waiver of the one-year contractual limitations period.

In Oklahoma, the statute of limitations for a bad faith claim is two years. *See*, 12 O.S. 2011 § 95(3). The plaintiffs's fire loss occurred on October 22, 2010, defendant's adjuster submitted a written estimate on November 23, 2010 and plaintiffs submitted their invoices to defendant for repairs on May 12, 2012.[2] Although there is no allegation as to the date when defendant refused to pay the invoices submitted on May 12, 2012, plaintiffs should have known by at least one year later, May 12, 2013, that the invoices were not paid and the petition was not filed within two years of that date. Given the allegations in the petition, the court concludes that the bad faith claim is time-barred and subject to dismissal under Rule 12(b)(6). The court recognizes that the discovery rule applies to the two-year statute of limitations period for bad faith claims. *See*, Miller v. Liberty Mut. Fire Ins. Co., 2008 OK CIV APP 65, 191 P.3d 1221, 1226 (Okla. Civ. App. 2008). Plaintiffs assert in their response that there is evidence to show that plaintiffs did not know or should have known two years prior to the filing of their action that their claims would not be paid. The court shall therefore permit plaintiffs **[*8]** to amend their petition to set forth factual allegations to show that their bad faith claim did not accrue more than two years prior to the filing of their action on August 9, 2016.

IV.

Based upon the foregoing, Defendant Liberty Mutual Fire Insurance Company's Motion to Dismiss (doc. no. 5) is **GRANTED**. However, plaintiffs are **GRANTED** leave to file an amended complaint within 10 business

days to support tolling or waiver of the one-year contractual limitations period for their breach of contract claims and to show that the bad faith claim did not accrue more than two years prior to the filing of their action. If plaintiffs do not file an amended complaint within 10 business days, the court shall enter judgment dismissing plaintiffs' petition and action with prejudice as barred by the applicable contractual and statutory limitations periods.

DATED October 21, 2016.

/s/ Stephen P. Friot

STEPHEN P. FRIOT

UNITED STATES DISTRICT JUDGE

---

**End of Document**

---

[2] Although defendant disputes that it received any repair invoices in 2012, the court, in adjudicating defendant's motion, must accept plaintiff's allegations as true. The court also cannot consider any of the factual allegations set forth by defendant in its motion as those allegations are not a part of the petition. Defendant's detailed and inexplicable recitation, in its Rule 12(b)(6) motion, of its version of the facts ignores the basic rules applicable to these motions and is a waste of time and paper.

◆ Positive
As of: May 3, 2021 2:13 PM Z

# Craig Pc Sales & Serv. v. Co. V.

United States District Court for the Western District of Oklahoma

April 30, 2018, Decided; April 30, 2018, Filed

Case No. CIV-17-003-F

## Reporter

2018 U.S. Dist. LEXIS 239280 *

CRAIG PC SALES & SERVICE, LLC, an Oklahoma limited liability company; RAY T. CRAIG, SR., an individual; and RAY T. CRAIG, II, an individual, Plaintiff, -vs- CDW GOVERNMENT, LLC, an Illinois limited liability company; and MICROSOFT CORPORATION, a Washington corporation, Defendants.

## Core Terms

licenses, plaintiffs', court concludes, school district, software, specific evidence, allegations, motion to dismiss, expectancy, malicious prosecution claim, termination, investigators, customers, prima facie case, alleged facts, federal rule, loading, substantial rights, hard disk, intentional interference, statute of limitations, discovery, prospective economic advantage, business relationship, probable cause, good cause, state law, employees, training, factual allegations

## Counsel:

[*1] For Craig PC Sales & Service Llc, an Oklahoma limited liability company, Ray T Craig, SR, an individual, Ray T Craig, JR, an individual, Plaintiffs: Bret T Burns, LEAD ATTORNEY, Burns Law Office, Chickasha, OK USA; Jonathan M Irwin, LEAD ATTORNEY, Barrett T Bowers, Geoffrey A Tabor, Stanley M Ward, Woodrow K Glass, Ward & Glass LLP, Norman, OK USA.

For Cdw Government Llc, an Illinois limited liability company, Defendant: Ronald T Shinn, Jr, LEAD ATTORNEY, McAfee & Taft-OKC, Oklahoma City, OK USA; William S Leach, LEAD ATTORNEY, McAfee & Taft-TULSA, Williams Tower Ii, Tulsa, OK USA; Autumn L Sharp, Thomas C Koessl, PRO HAC VICE, Lowis & Gellen LLP, Chicago, IL USA; Robert D Nelon, Hall

Estill-OKC, Oklahoma City, OK USA.

For Microsoft Corporation, a Washington corporation, Defendant: Ambika K Doran, Bonnie E MacNaughton, Caesar D Kalinowski, James H Wendell, Zana Bugaighis, PRO HAC VICE, Davis Wright Tremaine-SEATTLE, Seattle, WA USA; Lindsay N Kistler, Robert D Nelon, Hall Estill-OKC, Oklahoma City, OK USA.

**Judges:** STEPHEN P. FRIOT, UNITED STATES DISTRICT JUDGE.

**Opinion by:** STEPHEN P. FRIOT

## Opinion

**ORDER**

Before the court are CDW Government, LLC's Motion to Dismiss Plaintiff's First Amended Complaint (doc. no. 52) and [*2] Defendant Microsoft Corporation's Motion to Dismiss Pursuant to the Oklahoma Citizens Participation Act, Okla. Stat. tit. 12, § 1430, *et seq.*, and Fed. R. Civ. P. 12(b)(6) (doc. no. 53). Also before the court is CDW Government, LLC's Motion for Amended Order (doc. no. 65). Upon due consideration of the parties' submissions with respect to the motions, the court makes its determination.

*Standard of Review*

Both defendants seek dismissal of plaintiffs' First

2018 U.S. Dist. LEXIS 239280, *2

Amended Complaint (doc. no. 31) pursuant to Rule 12(b)(6), Fed. R. Civ. P. The Tenth Circuit recently summarized the Rule 12(b)(6) standard of review in Safe Streets Alliance v. Hickenlooper, 859 F.3d 865 (10th Cir. 2017):

"A pleading is required to contain a 'short and plain statement of the claim showing that the pleader is entitled to relief.'" SEC v. Shields, 744 F.3d 633, 640 (10th Cir. 2014) (quoting Fed. R. Civ. P. 8(a)(2)). "We accept as true all well-pleaded factual allegations in the complaint and view them in the light most favorable to the" plaintiff. Id. (quoting Burnett v. Mort. Elec. Registration Sys., Inc., 706 F.3d 1231, 1235 (10th Cir. 2013)). We then "determine whether the plaintiff has provided 'enough facts to state a claim to relief that is plausible on its face.'" George [v. Urban Settlement Servs., 833 F.3d 1242, 1247 (10th Cir. 2016)] (quoting Hogan v. Winder, 762 F.3d 1096, 1104 (10th Cir. 2014)).

"In determining the plausibility of a claim, we look to the elements of the particular cause of action, keeping in mind that the Rule 12(b)(6) standard [does not] require a plaintiff to 'set forth a prima facie case for each element.'" Id. (quoting Khalik v. United Air Lines, 671 F.3d 1188, 1192-93 (10th Cir. 2012)). "The nature and [*3] specificity of the allegations required to state a plausible claim will vary based on context." Kan. Penn Gaming, LLC v. Collins, 656 F.3d 1210, 1215 (10th Cir. 2011). But "mere 'labels and conclusions' and 'a formulaic recitation of the elements of a cause of action' will not suffice; a plaintiff must offer specific factual allegations to support each claim." Id. at 1214 (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)). Thus, a "claim is facially plausible if the plaintiff has pled 'factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.'" George, 833 F.3d at 1247 (quoting Hogan, 762 F.3d at 1104, which in turn quotes Ashcroft v. Iqbal, 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009)).

Id. at 878.

Defendant, Microsoft Corporation, also seeks dismissal of plaintiffs' state law claims pursuant to the Oklahoma Citizens Participation Act ("OCPA"), 12 O.S. § 1430, et seq. As plaintiffs have challenged whether the OCPA applies to their claims, the court will address that statute later in this order.

I. Relevant Facts

Accepting all well-pleaded factual allegations in the First Amended Complaint as true and viewing them in the light most favorable to plaintiffs, the relevant facts are as follows.

Plaintiff, Craig PC Sales & Service, LLC ("Craig PC"), is a family owned and operated computer business, providing computer sales, maintenance, and service to public and private clients [*4] in and around Oklahoma. It has been operating since 1993. Plaintiff, Ray T. Craig, Sr. ("Craig Sr."), and plaintiff, Ray T. Craig, II ("Craig II"), are father and son and formed Craig PC. Both Craig Sr. and Craig II are citizens of Oklahoma.

Defendant, Microsoft Corporation ("Microsoft"), is a Washington corporation, with its principal place of business in Redmond, Washington. At all times relevant to this action, it developed, advertised, marketed, distributed, and licensed a number of computer software programs, including the Microsoft Windows operating system ("Windows") and the Microsoft Office Suite ("Office"). Microsoft sells licenses for the use of its software programs, including Windows and Office, rather than selling the software outright. It sells the licenses through business partners, known as Microsoft Partners. Microsoft trains and relies on its partners to provide advice and support to customers about obtaining the right licenses and products for their individual needs.

Defendant, CDW Government, LLC ("CDWG"), is an Illinois limited liability company, with its principal place of business in Vernon Hills, Illinois.[1] CDWG obtains revenue by selling Microsoft software primarily [*5] to educational and healthcare institutions. CDWG is a member of Microsoft's Partner Network or Partner Program. CDWG has a website, which boasts of its expertise in software licensing and reassures its customers that its employees are trained to help them purchase the correct Microsoft products and licenses. It has published information on its website stating that a partnership with the company means: (1) customers "can finally be free of the burdensome, time-consuming complexities of managing software selection, customization, licensing, upgrades and ongoing maintenance;" (2) CDWG's "dedicated account teams"

---

[1] CDWG's sole member is CDW LLC and CDW LLC's sole member is CDW Corporation, a Delaware corporation with its principal place of business in Vernon Hills, Illinois.

can "take the guesswork out of software licensing and purchasing, and help guide you through which software licensing programs and products best fit your business requirements;" and (3) customers can "rely" on "specially-trained" software licensing specialists to "expertly assist you in determining the right licensing program to fit your needs." Doc. no. 31, ¶¶ 18, 19 and 20.

In or around 2006, CDWG hired a commissioned sales representative, Tyler Hardy ("Hardy"). Hardy's assigned sales territory included Oklahoma. Hardy received training, including training about Microsoft licensing [*6] agreements. Hardy's training included information about licenses specifically available for educational institutions and how to qualify for educational licenses. Microsoft was the primary provider of the training.

During Hardy's employment, Microsoft ensured that CDWG sold the correct product, including the correct software licensing, to its customers. As a part of every order fulfillment, a Microsoft employee would approve the purchase and issue the license.

After his sales duties commenced, Hardy began cold calling school districts in western Oklahoma that were customers of Craig PC. Hardy offered the schools Microsoft software at a discounted academic rate. This was based upon the training and information provided by CDWG and Microsoft.

Prior to Hardy's cold calls, Craig PC did not build computers. Instead, it purchased computers and resold them to school district customers. The purchased computers had Microsoft Windows preinstalled on them. Prior to 2006, Craig PC was not involved in purchasing Microsoft Windows licenses or installing Microsoft Windows, except on very limited occasions.

Also, prior to Hardy's cold calls, Craig PC purchased computers that had an Original Equipment Manufacturer [*7] ("OEM") license. This license included a Certificate of Authority ("COA") that was affixed to each computer. The OEM licenses sold at the same price without regard to the customer. There was no academic discount associated with the OEM licenses.

After Hardy began cold calling Craig PC's customers and offering to sell Microsoft Windows at reduced, academic discount pricing, Craig PC spoke with him to determine the propriety of the academic discount pricing.

Hardy told Craig PC, through its various agents and employees, including Craig II, that Craig PC could purchase Microsoft Windows licenses though the Volume Licensing channel for its educational clients. He further told Craig PC that it could install Microsoft Windows Volume Licenses on a "naked" computer, i.e. a computer that did not have a preinstalled Microsoft Windows operating system, for its educational clients. Doc. no. 31, ¶ 30.

In reliance on CDWG's purported expertise as explained on its website and in other oral representations, including its relationship as a Microsoft Partner, Craig PC began purchasing Microsoft Windows Volume Licenses for its school district clients and installing the product on new computers sold to the [*8] school districts.

CDWG's representations about the use of Volume Licenses on "naked" computers designed for school districts was consistent with technical support provided by Microsoft to Craig PC and to various school districts around Oklahoma.

CDWG and Microsoft, through various employees, explained to Craig PC that it was appropriate to use the same Product Key on multiple computers, for different school districts, so long as Craig PC purchased a Volume License for each separate computer. They also explained that it was appropriate to use Volume Licenses on "naked" computers designed for school districts even though the purchase of a Volume License did not include a COA label to affix to each computer.

CDWG and Microsoft, though various employees, explained to Craig PC that it was appropriate to "clone" or "image" one computer and use it to install all software on another computer, with the purchase of a Volume License for each separate computer.

From and after 2006, Craig PC relied on the representations in purchasing computers and software licenses for its school district customers.

Microsoft claims to have received a complaint on or around June 30, 2006 from Jason Hefley regarding [*9] Craig PC. Microsoft created an "Infringement Report" stating that Craig PC may be engaged in "hard disk loading." However, Jason Hefley never contacted Microsoft or made any complaint about Craig PC.

On May 29, 2007, Microsoft made a "test purchase" at Craig PC, which it passed by selling genuine Microsoft products with the proper licensing.

Microsoft claims to have received a complaint on or around May 20, 2009, from M. Warren about "highly suspicious activity" of Craig PC. Microsoft assigned Miles Hawkes ("Hawkes"), Senior Program Manager of Investigations, to investigate. On or around May 21, 2009, Hawkes had a telephone conversation with Derrick Thornton ("Thornton"), who owned and operated Industry Systems, Craig PC's competitor. According to Hawkes, Thornton told him no one could beat Craig PC's bids to school districts for computer sales and service, with the implication that Craig PC could underbid because it was engaged in copyright violations. Thornton, however, did not tell Hawkes that nobody could beat Craig PC's bids. Instead, he told Hawkes there was one occasion when his company could not beat a bid.

On or around June 16, 2009, Hawkes and another Microsoft investigator, [*10] Monty Montgomery ("Montgomery"), interviewed Thornton and two of his employees, Jeff Goodman ("Goodman") and James Coker ("Coker"). Goodman and Coker were former employees of Craig PC. Goodman had worked as a field technician from 1997 to 1998 and Coker had worked as a field technician from 2000 to 2004. Hawkes created written notes from the interviews and according to Hawkes, Goodman and Coker accused Craig PC of engaging in the practice of "hard disk loading." Doc. no. 31, ¶ 45. Coker told Hawkes that when he worked for Craig PC, the company sold around 100 computers a month and 99% were hard disk loaded.

According to Microsoft, hard disk loading is the installation of software for which a company has no license onto the computer's hard disk before the computer is sold to a customer. This allows a computer reseller to save money, because the same program can be installed at no additional cost on multiple computers.

Goodman and Coker, however, did not state that Craig PC engaged in "hard disk loading" as Microsoft used that term. They actually said that Craig PC used a hard disk to load the computer with software. In other words, the software was loaded with a CD. This is standard practice [*11] and does not violate any term of Microsoft's licensing agreements.

On July 17, 2009, Hawkes and Montgomery tested computers purportedly purchased by Friend School District and Hinton School District from Craig PC. According to the Microsoft investigators, the computers showed "massive hard disk loading" and many of the computers did not have a COA label attached to them.

Doc. no. 31, ¶ 50.

Craig PC had purchased all software licenses in compliance with instructions from CDWG and in a way that was consistent with the instructions later provided to Craig PC by Microsoft's technical support representatives.

In or around July 2009, Microsoft contacted the Oklahoma City Division of the Federal Bureau of Investigation ("FBI") and alleged Craig PC systematically sold Oklahoma schools pirated versions of Microsoft's Windows operating system software. The FBI assigned the investigation of Microsoft's allegations to the Norman Field Office, instead of the Cybercrime Unit. Special Agent Deborah Decker ("Decker") was in charge of the investigation.

Decker had never worked a copyright case and did not have any specific training in the area of cybercrime. She also had no training as to Microsoft's licensing [*12] requirements. Decker relied completely on the purported expertise of Microsoft's employees and agents in determining whether plaintiffs had committed copyright violations.

Decker spoke by telephone with Hawkes. He explained hard disk loading and represented that Craig PC was violating Microsoft's copyright by engaging in hard disk loading. Hawkes also explained the COA and represented that Craig PC was violating Microsoft's copyright by selling computers to school districts that did not have the COA labels affixed to them. Further, he explained Volume Licensing and represented that Craig PC was violating Microsoft's copyright by purchasing Volume Licenses for school district computers without an underlying OEM base license. Hawkes' statements to Decker were false or made in reckless disregard for the truth. Craig PC's actions were consistent with the support and instruction from CDWG and Microsoft.

In addition to the telephone conversation, Hawkes emailed Decker his written notes of the interviews with Goodman, Coker and Thornton and provided her with the alleged report of hard disk loading from Jason Hefley. Decker did not interview the men. She relied upon Hawkes' representations.

[*13] From February 9, 2010 through January 2011, Decker conducted an investigation into Craig PC. She maintained contact with the Microsoft investigators to report her findings and to obtain additional information about Microsoft's licensing requirements. Microsoft conducted all of the tests related to computers and

Decker relied upon Microsoft's interpretation of the test data.

On January 21, 2011, Montgomery represented to Decker that Craig PC purchased only 39 units of Microsoft software from July 1, 2008 through June 30, 2012. This statement was false or made with reckless disregard for the truth because Craig PC had purchased hundreds of units of Microsoft software in that period.

On January 24, 2011, Decker interviewed several school districts that were clients of Craig PC. Microsoft investigators were present during these interviews and conducted tests on certain computers. The investigators related to Decker that the test results showed Craig PC was violating Microsoft's copyright in multiple ways. However, the results showed, to the contrary, that Craig PC had purchased software licenses in compliance with the instructions it received from CDWG and in a way consistent with later explanations [*14] provided by Microsoft's technical support staff.

Decker presented an affidavit of probable cause to United States Magistrate Judge Gary M. Purcell on January 25, 2011. Plaintiffs allege that Decker made material statements in the affidavit that were false, or were made in reckless disregard for the truth. These statements included: (1) plaintiffs purchased only 39 Microsoft licenses from July 1, 2008 through June 30, 2012; (2) Thornton claimed his company could not compete with Craig PC's low-priced bids if his company's computers were properly loaded with new, licensed Microsoft operating systems; (3) Goodman and Coker stated that Craig PC engaged in extensive hard disk loading; (4) plaintiffs violated Microsoft's copyright by using the same Product Key on multiple computers for multiple clients; (5) plaintiffs violated Microsoft's copyright by failing to affix COAs to computers; (6) plaintiffs violated Microsoft's copyright by using Volume Licenses on "naked" computers; (7) plaintiffs violated Microsoft's copyright by removing the COA from certain computers; and (8) plaintiffs violated Microsoft's copyright by using a "key generator" for certain Microsoft Office programs. Doc. no. [*15] 31, ¶ 72.

Based on the false information provided by Microsoft and Decker, Magistrate Judge Purcell issued search and seizure warrants relating to Craig PC's business operations and assets. He also issued search and seizure warrants for Craig Sr. and Craig II's personal assets that were purportedly the fruits of their criminal activities, although they had engaged in no criminal activities. The FBI and United States Marshals Service executed the warrants on January 27, 2011. Montgomery and another Microsoft investigator, Randy Bradley ("Bradley"), assisted in the execution of the warrants. The FBI and the United States Marshals Service seized assets with an approximate value of $3.5 million.

On June 22, 2011, the United States of America filed a civil forfeiture action relating to the seized property. The complaint and supporting affidavit were sealed. From June 22, 2011 through December 2012, the government failed and refused to serve process on plaintiffs. Because the civil forfeiture action was sealed, plaintiffs did not have notice of the allegations against them. Plaintiffs filed a civil action against the United States of America regarding the property. The government finally served [*16] process in the civil forfeiture action on December 14, 2012, and plaintiffs dismissed their civil action.

Decker had solicited last minute help from Bradley prior to filing an amended affidavit of probable cause in the civil forfeiture action. She sought help about basic concepts regarding Microsoft's licensing and Craig PC's purchases.

Decker and Microsoft learned during the investigation that CDWG had provided instructions to others besides plaintiffs to engage in the same type of licensing purchasing that Microsoft stated was in violation of its copyright. Decker and Microsoft investigators, however, looked the other way and failed to take that information into account during the investigation.

In or around November and December 2012, the United States of America presented testimony to the grand jury in an effort to seek an indictment against plaintiffs. No indictment was ever issued. At some time between December 2012 and May 2015, the United States Attorneys' Office declined to press criminal charges against plaintiffs.

In 2014, plaintiffs and the United States of America entered into a settlement agreement of the civil forfeiture action, wherein plaintiffs agreed to pay a sum of [*17] money to resolve the case but did not admit any wrongdoing.

Unbeknownst to plaintiffs, prior to the execution of the settlement agreement, Decker and Microsoft's investigators presented the same claims of criminal copyright infringement to the Oklahoma Attorney General.

On November 5, 2014, the State of Oklahoma filed criminal felony charges against Craig Sr., Craig II and a non-party. The charges were supported by an affidavit of Decker. Decker allegedly supplied the same false information as that provided in the affidavit presented to Magistrate Judge Purcell. Microsoft investigator, Bradley, and a purported licensing expert and Microsoft employee, Enoch Remick, provided testimony at plaintiffs' preliminary hearing. The testimony was false or made in reckless disregard for the truth. Craig PC's conduct in purchasing Microsoft software was in compliance with instructions from CDWG and was consistent with the explanations later provided to Craig PC and others by Microsoft's technical support representatives. However, as result of that false testimony, the state court found probable cause and bound plaintiffs over for trial. In the absence of the allegedly false or reckless testimony [*18] by Microsoft's employees and Decker, there was insufficient evidence to support a finding of probable cause.

On September 13, 2016, the State of Oklahoma moved to dismiss all charges against Craig Sr., Craig II and the non-party and agreed in writing not to refile the charges. Craig Sr. pled no contest to a different charge, a criminal misdemeanor. Craig II did not plead guilty or no contest to any criminal charges. The state court entered an order of expungement in favor of Craig II on November 7, 2015.

Microsoft and CDWG had the ability to end the criminal investigations, civil forfeiture action, and state criminal charges against plaintiffs at any point in time.

Microsoft made false allegations or made allegations in reckless disregard of the truth that plaintiffs violated its copyright when it knew they did not. If Microsoft had revealed the truth, the investigation, civil forfeiture and criminal charges would have terminated.

CDWG also made false allegations or made allegations in reckless disregard of the truth during the course of the investigation. Specifically, it stated that it sold Volume Licenses to Craig PC with the understanding that Craig PC was purchasing the Volume Licenses [*19] for computers that already had Microsoft OEM Licenses installed. CDWG knew or should have known that it was selling Volume Licenses to Craig PC for "naked" computers.

II. *CDWG's Dismissal Motion*

Based upon the above relevant facts, plaintiffs allege claims against CDWG for negligent misrepresentation, negligence and intentional interference with contractual relations and/or prospective economic advantage. CDWG seeks dismissal of all claims against it.

As to the negligent misrepresentation claim, CDWG contends that the Oklahoma Supreme Court has not expressly recognized such a claim. Even if it has recognized the claim, CDWG argues that plaintiffs fail to plead sufficient facts in the First Amended Complaint to establish that it did not exercise reasonable care in making the alleged misrepresentations. CDWG points out that plaintiffs allege Microsoft made the same alleged misrepresentations to plaintiffs. In addition, CDWG contends that plaintiffs fail to plead facts sufficient to establish that they reasonably relied on the alleged misrepresentations to their detriment. CDWG further contends that plaintiffs fail to allege sufficient facts to establish that it owed a duty of care to plaintiffs. [*20] Absent a duty of care, CDWG posits that plaintiffs' negligent misrepresentation claim fails.

Next, with respect to the negligence claim, CDWG asserts that plaintiffs fail to plead sufficient facts in the First Amended Complaint to establish that CDWG owed a duty of care to them. It also asserts that plaintiffs fail to allege adequate facts to establish that CDWG's alleged negligence was the proximate cause of their injuries. According to CDWG, plaintiffs' alleged facts establish several supervening causes of their injuries that break the proximate causal connection between CDWG's alleged negligence and plaintiffs' alleged injuries.

Lastly, regarding the intentional interference with contractual relations and/or prospective economic damage claim, CDWG asserts that the claim is barred by the applicable two-year statute of limitations. It also asserts that plaintiffs fail to allege facts in the First Amended Complaint to establish an intentional inference with any contract or valid business relationship or expectancy or that CDWG's conduct was the proximate cause of plaintiffs' injuries.

A. *Negligent Misrepresentation Claim*

"Oklahoma has adopted the Restatement (Second) of Torts § 552 for negligent misrepresentation." *See* [*21] , Lopez v. Rollins, 303 P.3d 911, 916 (Okla. Civ. App. 2013) (citing Stroud v. Arthur Anderson & Co., 37 P.3d 783, 793-794 (Okla. 2001)); *see also*, Greer v. SunTrust Mortg., Inc., 2013 WL 5520010, at * 6 (N.D. Okla. Oct. 3, 2013). Section 552 provides:

> One who, in the course of his business, profession or employment, or in any other transaction in which

he has a pecuniary interest, supplies false information for the guidance of others in their business transactions, is subject to liability for pecuniary loss caused to them by their justifiable reliance upon the information, if he fails to exercise reasonable care or competence in obtaining or communicating the information.

Restatement (Second) of Torts § 552.

If the circumstances of a case fall within § 552, a duty of care exists. *See*, Comment to § 552; *see also*, Greer, 2013 WL 5520010, at *6. Viewing the well-pleaded facts and all reasonable inferences therefrom in a light most favorable to plaintiffs,[2] the court concludes that the circumstances of this case are sufficient to fall within § 552. Taking the factual allegations reveal that CDWG provided false information in the course of its business to plaintiffs for their guidance in their business transactions with their clients; the plaintiffs relied upon the false information; the reliance was justifiable in light of the business relationship between CDWG and plaintiffs, CDWG's oral representations in response to inquiries from plaintiffs regarding the propriety of licenses purchased and specific [*22] written representations on its website; and that CDWG failed to exercise reasonable care or competence in communicating the false information. The court is not persuaded that, at the Rule 12(b)(6) stage, the facts that Microsoft primarily trained Hardy; that Microsoft's employees ensured that CDWG sold the correct product; and that CDWG's alleged misrepresentations were consistent with technical support provided by Microsoft and statements made by other various employees of Microsoft, preclude a finding that CDWG failed to exercise reasonable care or competence in making its statements to plaintiffs. Thus, the court concludes that plaintiffs have sufficiently alleged a plausible claim of negligent misrepresentation.

B. *Negligence Claim*

The elements of a negligence claim are: (1) a duty of care owed by defendant to plaintiff; (2) defendant's breach of that duty; and (3) injury to plaintiff caused by defendant's breach of that duty. Lowery v. Echostar Satellite Corp., 160 P.3d 959, 964 (Okla. 2007). As stated, CDWG asserts that plaintiffs' alleged facts do not establish a duty of care owed to plaintiffs by CDWG or that CDWG's alleged conduct proximately caused plaintiffs' alleged injuries. The court disagrees.

The threshold question for any negligence claim is the [*23] existence of a duty of care. Trinity Baptist Church v. Brotherhood Mutual Insurance Service LLC, 341 P.3d 75 (Okla. 2014). It appears to the court from allegations of the First Amended Complaint that plaintiffs are also alleging a negligence claim based upon CDWG's alleged misrepresentations. Based upon § 552, the court finds that plaintiffs have alleged facts sufficient to establish a duty of care for the negligent claim.

Turning to proximate cause, CDWG argues that plaintiffs cannot allege proximate cause because the allegations establish several supervening causes of their injuries. Specifically, CDWG contends that plaintiffs allege that Microsoft approved every purchase order and issued the licenses; Microsoft misinterpreted or falsified reports of complaints regarding improper licenses leading to the criminal investigation and criminal charges; Decker relied upon Microsoft in conducting that criminal investigation and Microsoft made allegedly false statements to her, which led to the criminal charges. These causes, CDWG asserts, insulate it from liability, even if it were negligent because of its alleged misrepresentations.

Under Oklahoma law, not every intervening cause insulates the original negligent actor from liability. Graham v. Keuchel, 847 P.2d 342, 348 (Okla. 1993). The law frequently views such a cause as capable [*24] of combining or acting in concert with another act or omission to produce the injury. The same may also be true when several causes operate to bring about a single result. Minor v. Zidell Trust, 618 P.2d 392, 394 (Okla. 1980). To rise to the magnitude of a supervening cause, thereby cutting off possible liability for the original negligence, the intervening cause must be (1) independent of the original act, (2) adequate of itself to bring about the result and (3) one whose occurrence was not reasonably foreseeable to the original actor. Graham, 847 P.2d at 348.

Viewing the well-pleaded facts and all reasonable inferences therefrom in a light most favorable to plaintiffs, the court concludes that plaintiffs have sufficiently pleaded facts to establish CDWG's alleged negligence was the proximate cause of their injuries. The court is not persuaded that the allegations in the First Amended Complaint establish each of the three elements required for finding that the actions cited by CDWG were supervening causes. Consequently, the

---

[2] Brokers' Choice of America, Inc. v. NBC Universal, Inc., 861 F.3d 1081, 1105 (10th Cir. 2017) (court must make all reasonable inferences in favor of the non-moving party).

court concludes that plaintiffs' negligence claim survives challenge under Rule 12(b)(6).

## C. *Interference Claims*

The elements of a claim for tortious interference with a contractual or business relationship are: (1) interference with an existing contractual [*25] or business right; (2) such interference was malicious and wrongful; (3) the interference was neither justified, privileged nor excusable; and (4) the interference proximately caused damage. Wilspec Technologies, Inc. v. DunAn Holding Group, Co., Ltd., 204 P.3d 69, 74 (Okla. 2009). The element of malice means "an unreasonable and wrongful act done intentionally, without just cause or excuse." Tuffy's, Inc. v. City of Oklahoma City, 212 P.3d 1158, 1165 (Okla. 2009). This element requires a showing of bad faith. *Id.* Further, the interference claim is viable only if the interferer is not a party to the contract or business relationship. Wilspec Technologies, Inc., 204 P.3d at 74.

The elements of a claim for tortious interference with prospective economic advantage are: (1) the existence of a valid business relation or expectancy; (2) knowledge of the relationship or expectancy on the part of the interferer; (3) an intentional interference inducing or causing a breach or termination of the relationship or expectancy; and (4) resultant damage to the party whose relationship has been disrupted. Lakeshore Cmty. Hosp., Inc. v. Perry, 538 N.W.2d 24, 27 (Mich. App. 1995); *see also*, Brock v. Thompson, 948 P.2d 279, 293 n. 58 (Okla. 1997) (citing Lakeshore for the elements of the tortious interference with prospective economic relations). "A [Restatement (Second) of Torts] section 766B claim of tortious inference with one's advantageous business relations will only lie where a defendant has acted with unlawful means." Wilspec Technologies, Inc., 204 P.3d at 72.

Upon review and viewing the well-pleaded facts [*26] and reasonable inferences therefrom in a light most favorable to plaintiffs, the court concludes that plaintiffs have alleged a plausible claim of malicious interference with a contractual or business right and a plausible claim of malicious interference with prospective economic advantage. Plaintiffs have alleged facts sufficient to establish that they had valid relationships and expectancies with various school districts and private clients to which CDWG was not a party; that CDWG interfered with the valid relationships and expectancies by "knowingly" selling plaintiffs software that, according to Microsoft, violated its copyright; that the interference caused plaintiffs to lose their relationships and expectancies with the school districts and private clients; that CDWG acted intentionally, maliciously, all in a money-making scheme, and that CDWG's interference was neither justified or privileged. The court is not convinced that in order to state their interference claims they must allege facts to show that CDWG engaged in improper means to "lure" plaintiffs' customers away. The facts in Overbeck v. Quaker Life Ins. Co., 757 P.2d 846 (Okla. Civ. App. 1984), are distinguishable from the case at bar. Moreover, claims under section 766A and section 766B of the Restatement (Second) of Torts also encompass the [*27] use of improper means to hinder plaintiffs' performance of a contract or prevent plaintiffs from continuing the prospective relationship. Further, assuming without deciding that plaintiffs must allege facts to show that the intentional interference was "directed at the business relationship between [plaintiffs] and some third party," *see*, RSF Partners, LLC v. Silvermine Opportunity Funding, LLC, 2014 WL 360009, *3 (N.D. Okla. Feb. 3, 2014), the court concludes that the well-pleaded facts and reasonable inferences therefrom, viewed in a light most favorable to plaintiffs, show that the alleged intentional interference was directed at the business relationships between plaintiffs and their customers. Lastly, despite CDWG's arguments to the contrary, the court concludes that at this stage, plaintiffs have sufficiently alleged proximate cause.

## D. *Statute of Limitations*

CDWG additionally argues that plaintiffs' interference claims are barred by the applicable two-year statute of limitations for torts, 12 O.S. 2011 § 95. CDWG contends that plaintiffs' claims expired in 2008, long before their original petition was filed in state court in 2013.

An affirmative defense, such as the statute of limitations, may be raised on a motion under Rule 12(b)(6). Aldrich v. McCulloch Properties, Inc., 627 F.2d 1036, 1041 n. 4 (10th Cir. 1980)). The court, however, cannot grant the motion unless the affirmative defense [*28] appears plainly on the face of the complaint itself. Miller v. Shell Oil Co., 345 F.2d 891, 893 (10th Cir. 1965). The court is not convinced that the affirmative defense plainly appears on the face of plaintiff's First Amended Complaint. Thus, the court concludes that dismissal of plaintiffs' tortious interference claims, based upon the statute of limitations, is not appropriate.

In sum, the court concludes that plaintiffs' First Amended Complaint alleges plausible claims of negligent misrepresentation, negligence and intentional

interference with contractual relations and/or prospective economic advantage against CDWG. Accordingly, the court finds that CDWG's Rule 12(b)(6) dismissal motion should be denied.

## III. *Microsoft's Dismissal Motion*

Based upon the relevant facts previously cited, plaintiffs, Craig PC and Craig II, allege claims against Microsoft for malicious prosecution under 42 U.S.C. § 1983 and Oklahoma law and all plaintiffs allege claims against Microsoft for intentional interference with contractual relations and prospective economic advantage under Oklahoma law. Microsoft seeks to dismiss the state law claims for malicious prosecution and intentional interference with contractual relations and prospective economic advantage under the Oklahoma Citizens Participation [*29] Act ("OCPA"), 12 O.S. Supp. 2014 § 1430, *et seq.*, or, alternatively, under Rule 12(b)(6). It seeks to dismiss the claims for malicious prosecution under § 1983 under Rule 12(b)(6).

### A. *Application of OCPA*

"The purpose of the OCPA is to encourage and safeguard the constitutional rights of persons to petition, speak freely, associate freely and otherwise participate in government to the maximum extent permitted by law and, at the same time, protect the rights of a person to file meritorious lawsuits for demonstrable injury." 12 O.S. Supp. 2014 § 1430(B). To achieve this purpose, the OCPA provides a means for a defendant to seek dismissal, at an early stage, of a legal action if that action is based on, relates to or is in response to one of the stated rights. *See,* 12 O.S. Supp. 2014 § 1432 (A) ("If a legal action is based on, relates to or is in response to a party's exercise of the right of free speech, right to petition or right of association, [the defendant] may file a motion to dismiss the legal action.") According to the Oklahoma Supreme Court, the OCPA is "enacted to counteract lawsuits commonly known as SLAPP suits or strategic lawsuits against public participation which are aimed at deterring public participation in decision-making forums." *Anagnost v. Tomecek*, 390 P.3d 707, 710 (Okla. 2017).

The OCPA, an anti-SLAPP statute, sets forth a three-step [*30] procedure when a defendant moves to dismiss. First, the defendant must show by a preponderance of the evidence that "the legal action is based on, relates to, or is in response to, the party's exercise" of his "right of free speech," "right to petition" or "right of association." 12 O.S. Supp. 2014 § 1434(B). A "legal action" means "a lawsuit, cause of action,

petition, complaint, cross-claim, counterclaim or any other judicial pleading or filing that requests legal or equitable relief." 12 O.S. Supp. 2014 § 1431(6). If the defendant meets its initial burden, the court must dismiss the action unless the plaintiff establishes by "clear and specific evidence a prima facie case for each essential element of the claim in question." 12 O.S. Supp. 2014 § 1434(C). Even if the plaintiff satisfies his burden, the court must dismiss the action if the defendant establishes by a preponderance of the evidence each essential element of a valid defense to the plaintiff's claim. 12 O.S. Supp. 2014 § 1434(D).

In determining whether an action should be dismissed, the court is required to consider the "pleadings and supporting and opposing affidavits stating the facts on which the liability or defense is based." 12 O.S. Supp. 2014 § 1435(A). The court, upon motion or on its own motion and on a showing of good cause, may allow specified and [*31] limited discovery relevant to the motion to dismiss. 12 O.S. Supp. 2014 § 1435(B). If the court orders dismissal of the legal action, the court "shall" award the defendant its court costs, reasonable attorney fees, other expenses and sanctions. 12 O.S. Supp. 2014 § 1438.

Plaintiffs argue that the OCPA does not apply to their state law claims in federal court. Specifically, they argue that the statute has no application because it conflicts with the Rules 12 and 56 of the Federal Rules of Civil Procedure. The Tenth Circuit has not addressed whether the OCPA should apply in a federal diversity case.

In *Los Lobos Renewable Power, LLC v. Americulture, Inc.,* 885 F.3d 659 (10th Cir. 2018), the Tenth Circuit recently addressed the applicability of the New Mexico anti-SLAPP statute in a federal diversity case. The Tenth Circuit recognized that in a federal diversity case, the district court applies state substantive law and federal procedural law. *Id.* at 668. It also recognized that state laws that solely address procedure and do not function as part of a state's definition of substantive rights and remedies are inapplicable in federal diversity actions. *Id.* In addition, the Tenth Circuit recognized that distinguishing between procedural and substantive law is not always a simple task. *Id.* However, upon review of the New Mexico statute, it determined that drawing the line between procedure [*32] and substance was not a "'challenging endeavor,'" and that the statute was clearly a "*procedural* mechanism designed to expedite the disposal of frivolous lawsuits aimed at threatening free speech rights." *Id.* at 668-669. Therefore, it found that

the statute did not apply to the federal diversity action.

Here, the OCPA is not similar to the New Mexico anti-SLAPP statute. Rather, as asserted by Microsoft, it is similar to Texas's anti-SLAPP statute, the Texas Citizens Participation Act ("TCPA"), Tex. Civ. Prac. & Rem. Code Ann § 27.001, et seq. The Fifth Circuit has not directly addressed whether the TCPA should be applied in a federal diversity suit. Rather, it has assumed without deciding its applicability to federal diversity cases. Cuba v. Pylant, 814 F.3d 701, 718 (5th Cir. 2016) (James E. Graves, Jr., Circuit Judge dissenting), see also, Mathiew v. Subsea 7 (US) LLC, 2018 WL 1515264, *5 (S.D. Tex. March 9, 2018) (Report and Recommendation later affirmed by District Court on March 27, 2018). In Cuba v. Pylant, Circuit Judge Graves, in his dissent, squarely addressed the issue and concluded that the statute was procedural and must be ignored. He determined that "[t]he TCPA is codified in the Texas Civil Practice and Remedies Code, provides for a pre-trial motion to dismiss claims subject to its coverage, establishes time limits for consideration [*33] of such motions to dismiss, grants a right to appeal a denial of the motion, and authorizes the award of attorneys' fees if a claim is dismissed. This creates no substantive rule of Texas law; rather, the TCPA is clearly a procedural mechanism for speedy dismissal of a meritless lawsuit that infringes on certain constitutional protections." Id. at 719.[3] Judge Graves, however, also concluded that even if the TCPA were substantive, it conflicted with Rules 12 and 56 of the Federal Rule of Civil Procedure and found that those rules applied instead of the TCPA because the federal procedural rules were valid under the Rules Enabling Act. In so concluding, Judge Graves followed the plurality opinion of Justice Antonin Scalia in Shady Grove Orthopedic Associates, P.A. v. Allstate Insurance Co., 559 U.S. 393 (2010).

In Racher v. Westlake Nursing Home Limited Partnership, 871 F.3d 1152, 1162 (10th Cir. 2017), the Tenth Circuit recently stated:

> In diversity cases, the Erie[4] doctrine instructs that federal courts must apply state substantive law and

federal procedural law. Gasperini, 518 U.S. at 427, 116 S.Ct. 2211; James River Ins. Co. v. Rapid Funding, LLC, 658 F.3d 1207, 1216-17 (10th Cir. 2011). If a federal rule of civil procedure answers the question in dispute, that rule governs our decision so long as it does not "exceed[ ] statutory authorization or Congress's rulemaking power." Shady Grove[5] 559 U.S. at 398, 130 S.Ct. 1431; Hanna v. Plumer, 380 U.S. 460, 471, 85 S.Ct. 1136, 14 L.Ed.2d 8 (1965). When faced with a choice between a state law and an allegedly conflicting federal rule, we follow the framework described by the Supreme Court in Shady Grove, [*34] as laid out by Justice Stevens in his concurring opinion. James River, 658 F.3d at 1217 (citing Garman v. Campbell Cnty. Sch. Dist. No. 1, 630 F.3d 977, 983 n.6 (10th Cir. 2010)). First, the court must decide "whether the scope of the federal rule is 'sufficiently broad'" to '"control the issue"' before the court, 'thereby leaving no room for the operation' of seemingly conflicting state law." Shady Grove, 559 U.S. at 421, 130 S.Ct. 1431 (Stevens, J., concurring) (quoting Burlington N. R.R. v. Woods, 480 U.S. 1, 4-5, 107 S.Ct. 967, 94 L.Ed.2d 1 (1987)); James River, 658 F.3d at 1218. When conducting this analysis, the Federal Rules should be given their plain meaning. Walker v. Armco Steel Corp., 446 U.S. 740, 750 n. 9, 100 S.Ct. 1978, 64 L.Ed.2d 659 (1980). There is a conflict only if there is a "direct collision" between federal and state law—one that is "unavoidable." Id. at 749-50, 100 S.Ct. 1978 (first quoting Hanna, 380 U.S. at 472, 85 S.Ct. 1136; then quoting id. at 470, 85 S.Ct. 1136). If the state and federal rules "can exist side by side, . . . each controlling its own intended sphere of coverage," there is no conflict. Id. at 752, 100 S.Ct. 1978; Scottsdale Ins. Co. v. Tolliver, 636 F.3d 1273, 1277 (10th Cir. 2011). If there is a direct collision between the state law and the federal rule, the court must next determine whether the federal rule is valid. Shady Grove, 559 U.S. at 422, 130 S.Ct. 1431; James River, 658 F.3d at 1218. If it is, that rule governs the dispute and there is no need to "wade into Erie's murky waters." Shady Grove, 559 U.S. at 398, 130 S.Ct. 1431 (majority opinion). If there is no direct collision, however, there is no need to consider whether the federal rule is valid, and instead, the analysis must proceed under Erie. See Walker, 446 U.S. at 749-50, 752-53, 752 n.14,

---

[3] The court notes that Chief Judge Joe Heaton, following the court in Ruder v. Jordan, 2015 WL 4397636, at *2 (Tex. App. July 20, 2015) interpreting the TCPA as a "special procedure for the dismissal" of retaliatory lawsuits, concluded the OCPA was procedural.

[4] Erie R.R. v. Tompkins, 304 U.S. 64 (1938).

---

[5] Shady Grove Orthopedic Associates, P.A. v. Allstate Insurance Co., 559 U.S. 393 (2010).

100 S.Ct. 1978.
* * * *

Where . . . a federal procedural rule governs the question at [*35] issue, that rule controls—"notwithstanding" state law—so long as the federal rule is a valid exercise of authority given to the Supreme Court to enact federal rules of civil procedure pursuant to the Rules Enabling Act, 28 U.S.C. § 2072. See Shady Grove, 559 U.S. at 406-07, 130 S.Ct. 1431; Hanna v. Plumer, 380 U.S. 460, 463-64, 85 S.Ct. 1136, 14 L.Ed.2d 8 (1965); see also James River Ins. Co. v. Rapid Funding LLC, 658 F.3d 1207, 1217 (10th Cir. 2011).
* * * *

However, Congress expressly provided in the Enabling Act that procedural rules adopted by the Supreme Court must "not abridge, enlarge or modify a substantive right." 28 U.S.C. § 2702(b); see also Shady Grove, 559 U.S. at 407, 130 S.Ct. 1431. Justice Stevens, in his controlling concurrence in Shady Grove, addressed how, in a diversity case where state substantive law applies, to analyze whether a federal rule of procedure abridges, enlarges or modifies a substantive right. Id. at 418-21, 130 S.Ct. 1431 (Stevens, J., concurring); see Gasperini, 518 U.S at 427, 116 S.Ct. 2211. Justice Stevens advised courts not to rely on "whether the state law at issue takes the form of what is traditionally described as substantive or procedural." Shady Grove, 559 U.S. at 419, 130 S.Ct. 1431 (Stevens, J., concurring). Rather, a more nuanced approach is required. Id. at 419-20, 130 S.Ct. 1431. . . . Ultimately, a court must consider whether the federal procedural rule has displaced "a State's definition of its own rights or remedies." Id. 418, 130 S.Ct. 1431. If so, the federal rule may be invalid under the Rules Enabling Act because the federal rule abridges, enlarges or modifies [*36] a state substantive right.

Racher, 871 F.3d at 1162-1164 (footnotes added and footnote in original omitted).

Initially, the court concludes, as did Circuit Judge Graves in Cuba v. Pylant, that the OCPA does conflict with Rule 12 of the Federal Rules of Civil Procedure. In order to overcome dismissal of their claims under the OCPA, plaintiffs must establish by "clear and specific evidence" a prima facie case for each essential element of their claims. The OCPA does not define what clear and specific evidence means and the Oklahoma

Supreme Court has not addressed the matter. The word "clear" has been interpreted by the Texas Supreme Court to mean "unambiguous," "sure," or "free from doubt" and the word "specific" to mean "explicit or relating to a particular named thing." In re Lipsky, 460 S.W.3d 579, 590 (Tex. 2015). "Prima facie case" means the "minimum quantum of evidence necessary to support a rational inference that the allegation of fact is true." Id. (quotation omitted). In the court's view, the clear and specific evidence standard of the OCPA conflicts with the Rule 12(b)(6) pleading standard. To overcome a Rule 12(b)(6) motion, a plaintiff must only allege "sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009). A claim has facial plausibility when the plaintiff pleads factual [*37] content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id. "Plausible" does not mean "likely to be true." Robbins v. Oklahoma, 519 F.3d 1242, 1247 (10th Cir. 2008). Further, unlike the OCPA standard, the Rule 12(b)(6) standard does not require that a plaintiff establish a prima facie case for each element of a claim in the complaint, the elements of each claim merely help to determine whether plaintiff has set forth a plausible claim. Safe Streets Alliance, 859 F.3d at 878; see also, Khalik, 671 F.3d at 1192-1193.

Notably, when applying Rule 12(b)(6) in determining whether a plausible claim has been stated, the court must accept the well-pleaded facts as true. Iqbal, 556 U.S. at 678. The court therefore, with limited exceptions, does not look beyond the pleadings. In contrast, the OCPA mandates that the court "consider the pleadings" as well as the "supporting and opposing affidavits" in making its determination. 12 O.S. Supp. 2014 § 1435(A) ("[T]he court shall consider the pleadings and supporting and opposing affidavits stating the facts on which the liability . . . is based.") Upon motion and a showing of good cause, the court may also allow specific and limited discovery, id. at § 1435(B), and thus, consider that evidence. Although Rule 12(d), Fed. R. Civ. P., permits the court to consider material outside of the pleadings, the court, if it does [*38] consider such material, must treat the Rule 12(b)(6) motion as one for summary judgment under Rule 56, Fed. R. Civ. P. The OCPA's procedure is not akin to a motion for summary judgment under Rule 56.

The court also concludes, as did Judge Graves in Cuba v. Pylant, that the OCPA conflicts with Rule 56. Under Rule 56, summary judgment is appropriate if the "movant shows that there is no genuine dispute as to

any material fact and the movant is entitled to judgment as a matter of law." Rule 56(a), Fed. R. Civ. P. Rule 56 places the initial burden on the movant and then shifts the burden to the non-movant to show that there is a genuine dispute of material fact that merits trial. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). The OCPA does not require a moving party to show that there is an absence of a genuine issue of material fact with respect to non-movant's claims and that it is entitled to judgment as a matter of law. It only requires the moving party to show that the non-movant's claims arise from the moving party's exercise of a protected right within the OCPA's coverage. Further, the court's inquiry under Rule 56 is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 251-252 (1986). Under the OCPA, the court is to inquire [*39] whether there is evidence that "support[s] a rational inference that the allegation of fact is true." In re Lipsky, 460 S.W.3d at 590. Therefore, the court concludes that Rule 56 and the OCPA's standards conflict.

Moreover, the OCPA provides that even if a plaintiff establishes a prima facie case for each element of the claim in question by specific and clear evidence, the court must still dismiss if the moving party establishes by a preponderance of the evidence each essential element of a valid defense to the nonmovant's claim. In so doing, the defendant may rely upon affidavits. 12 O.S. § 1435(A). Rule 12 does not provide a mechanism for the court to evaluate the merits of a defense in such manner. Although Rule 12(d) would permit the court to look at material outside the pleadings in addressing a defense, such a motion, as stated, would be treated as one for summary judgment under Rule 56. As discussed, the court's inquiry under Rule 56 would be "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." Anderson, 477 U.S. at 251-252. The OCPA requires the court to determine whether it is more likely than not the defendant has established each element of the defense. This is not [*40] the same as deciding that it is "so one-sided" that defendant must prevail on the defense. The OCPA would allow dismissal, even if the nonmoving party could establish a sufficient disagreement to require submission to a jury, but the court concludes that defendant has presented the defense by a preponderance of the evidence. Thus, the OCPA allows the court, rather than the jury, to make a determination that a defense is established by the preponderance of the evidence, even if there may be disputing evidence.

For the reasons stated, the court concludes that the OCPA three-step procedure conflicts with Rule 12 and Rule 56's mechanisms for determining whether plaintiffs' state law claims may proceed to discovery or to trial. Further, the court concludes that Rules 12 and Rule 56 "answers the question in dispute," i.e. whether plaintiffs' state law claims are sufficient to proceed to discovery or to trial. In the court's view, the OCPA and the federal procedural rules cannot exist side by side.[6]

Because the court finds that the OCPA conflicts with Rule 12 and Rule 56, the court must determine whether those rules violate the Rules Enabling Act. Circuit Judge Graves, following Justice Scalia's plurality opinion, concluded that the [*41] rules are valid under the Rules Enabling Act because they truly regulate "'the judicial process for enforcing rights and duties recognized by substantive law and for justly administering remedy and redress for disregard or infraction of them.'" Cuba, 814 F.3d at 720. Circuit Judge Brett M. Kavanaugh, in Abbas v. Foreign Policy Group, LLC, 783 F.3d 1328, 1337 (D.C. Cir. 2015), also determined that Rule 12 and Rule 56 are valid under the Rules Enabling Act, following the Supreme Court's "really regulates procedure" test in Sibbach v. Wilson & Co., 312 U.S. 1 (1941), which was followed by Justice Scalia in his plurality opinion in Shady Grove.

However, the Tenth Circuit follows Justice John Paul Stevens' concurrence in Shady Grove as the controlling analysis, rather than Justice Scalia's plurality opinion. Racher, 871 F.3d at 1164; see also, James River, 658 F.3d at 1217; Garman v. Campbell Cnty. Sch. Dist., 630 F.3d 977, 983 & n. 6 (10th Cir. 2010), but see, Jones v. United Parcel Service, Inc., 674 F.3d 1187, 1206 (10th Cir. 2012) (applying Sibbach and Justice Scalia's plurality opinion in Shady Grove). Thus, the court must consider whether the federal procedural rules displace "'a State's definition of its own rights or remedies.'" Racher, 871 F.3d at 1164, quoting Justice Stevens' concurring opinion in Shady Grove, 559 U.S. at 418. If

---

[6] In so concluding, the court notes that the Ninth Circuit in reviewing California's anti-Slapp statute, in U.S. ex rel. Newsham v. Lockheed Missiles & Space Co., Inc., 190 F.3d 963, 973 (9th Cir. 1999) and the First Circuit in reviewing Maine's anti-Slapp statute in Godin v. Schencks, 629 F.3d 79, 91 (1st Cir. 2010), concluded that the statutes and Rules 12 and 56 could exist side by side. The court respectfully disagrees with respect to the OCPA and Rules 12 and 56.

so, the federal rule may be invalid under the Rules Enabling Act because the federal rule abridges, enlarges or modifies a state substantive right. *Id.*

For Justice Stevens, the analysis does not necessarily turn on whether the state law at issue takes [*42] the *form* of what is traditionally described as substantive or procedural. "Rather, it turns on whether the state law actually is part of a State's framework of substantive rights or remedies." Shady Grove, 559 U.S. at 419. He concluded that a state law "may in some instances become so bound up with the state-created right or remedy that it defines the scope of that substantive right or remedy." *Id.* at 420. "Such laws, for example, may be seemingly procedural rules that make it significantly more difficult to bring or to prove a claim, thus serving to limit the scope of that claim." *Id.*

Following Justice Stevens' analysis, the court concludes that applying Rule 12 and Rule 56 rather than the OCPA would abridge or modify Oklahoma's substantive rights. As Microsoft argues, in its papers, application of Rule 12 and Rule 56 would abridge or modify the substantive rights of the newly created defense, "immunity from suit," and the requirement of fee shifting as recognized by the Oklahoma Supreme Court in Anagnost v. Tomecek, 390 P.3d 707, 712 (Okla. 2017). The Oklahoma Supreme Court has specifically interpreted the OCPA to "create a new defense to causes of action involving first amendment rights, which effectively provides immunity from suit." *Id.*[7] The three-step procedure of the OCPA, as applied, makes it "significantly [*43] more difficult to bring . . . a claim, thus serving to limit the scope of that claim." Shady Grove, 559 U.S. at 420. The Oklahoma Supreme Court also has interpreted the OCPA as allowing the target of anti-SLAPP suits "to recover damages by providing award of attorney fees, costs and other reasonable expenses as well as sanctions in the event that a motion to dismiss is granted." Anagnost, 390 P.3d at 712. These damages are mandated if the court orders dismis sal pu rsuant to the O CPA. Ac co rding to the Oklahoma Supreme Court, "[s]tatutory amendments

which permit newly recoverable damages are an enlargement of substantive rights. . . ." *Id.* In the case at bar, the application of Rule 12 or Rule 56 instead of the OCPA would therefore abridge or modify the state substantive right to recover attorney's fees as recognized by the Oklahoma Supreme Court. Although Justice Stevens cautioned that the bar for finding a violation of the Rules Enabling Act is "a high one," the court concludes that Rules 12 and 56 cannot be applied here in a manner consistent with the strictures of the Rules Enabling Act, since they abridge or modify substantive rights as recognized by the Oklahoma Supreme Court. Shady Grove, 559 U.S. at 432. Because Rules 12 and Rule 56 may not, consistently with the Rules Enabling Act and Justice [*44] Stevens' concurring opinion, be applied here, and the court concludes that application of the OCPA conforms with the twin aims of Erie "discouragement of forum-shopping and avoidance of inequitable administration of the laws," Hanna, 380 U.S. at 468, the court will apply the OCPA to plaintiffs' claims.

In its briefing, plaintiffs request that if the court finds that the OCPA applies, the court should require Microsoft to file a motion in compliance with LCvR 56.1. However, Microsoft's motion is not a motion for summary judgment under Rule 56, Fed. R. Civ. P. Rather, it is a motion seeking dismissal under the OCPA. Consequently, Microsoft need not refile its motion in compliance with LCvR 56.1.

The OCPA requires Microsoft to show by a preponderance of the evidence that the legal action of plaintiffs is based on, relates to, or is in response to the party's exercise of the "right of free speech," the "right to petition" or the "right of association." The court concludes that Microsoft has satisfied its burden and plaintiffs do not suggest otherwise. It is clear to the court that plaintiffs' state law claims for malicious prosecution and intentional interference with contractual relations or prospective economic advantage are [*45] based upon Microsoft's alleged false representations to law enforcement authorities. See, 12 O.S. Supp. 2014 § 1431(4) ("Exercise of the right to petition" means "a communication that is reasonably likely to encourage consideration or review of an issue by a legislative, executive, judicial or other governmental body."); see also, Charalambopoulos v. Grammer, 2015 WL 390664, at * 6 (N.D. Tex. Jan. 2015).

The burden therefore shifts to plaintiffs, whose claims must be dismissed unless plaintiffs establish by clear and specific evidence a prima facie case for each

---

[7] The court notes that the Second Circuit in Liberty Synergistics Inc. v. Microflo Ltd., 718 F.3d 138 (2nd Cir. 2013), disagreeing with the Ninth Circuit in Batzel v. Smith, 333 F.3d 1018, 1025 (9th Cir. 2003), concluded that California's anti-SLAPP statute, which shifts burdens of proof, is not "a substantive immunity from suit." 718 F.3d at 148, n. 9. But see, Travelers Casualty Ins. Co. of America v. Hirsh, 831 F.3d 1179, 1181 (9th Cir. 2016) (per curiam opinion) (following Batzel).

essential element of the claim in question. Plaintiffs may do this in the form of pleadings or affidavits. 12 O.S. Supp. 2014 § 1235(A). On motion of plaintiffs or the court's own motion and a showing of good cause, the court may allow specified and limited discovery relevant to the motion. 12 O.S. Supp. 2014 § 1235(B). The court only has the First Amended Complaint before it. This is understandable in light of plaintiffs' challenge to the OCPA's applicability and the absence of controlling authority on the matter. The court, however, concludes that based upon the court's ruling on an unresolved issue, good cause exists to afford the plaintiffs an opportunity to present supporting affidavits relevant to the issues stated below or to conduct limited discovery relevant to those issues. [*46] [8] The court will outline the elements of plaintiffs' state law claims, which the court, based only on a review of the First Amended Complaint and Microsoft's submissions, concludes that clear and specific evidence of a prima facie case has not been adequately shown.

B. *Malicious Prosecution Claim*

The elements of a claim for malicious prosecution under Oklahoma law are: (1) the prosecution was commenced against plaintiff; (2) it was instituted or instigated by defendant; (3) it was malicious; (4) it has been legally and finally terminated in plaintiff's favor; and (5) it was without probable cause. Kitchens v. Bryan County Nat. Bank, 825 F.2d 248, 251 (10th Cir. 1987); Park v. Security Bank & Trust Co., 512 P.2d 113, 119 (Okla. 1973).

Initially, the court concludes that the First Amended Complaint does not allege facts sufficient to establish by clear and specific evidence a prima facie case for the

first element of the claim for malicious prosecution as to plaintiff, Craig PC. The First Amended Complaint does not allege that any criminal charge was filed or any prosecution was commenced against Craig PC. Thus, plaintiff, Craig PC, has not established the first element of a malicious prosecution claim—"prosecution was commenced against plaintiff." Plaintiff, Craig PC, in briefing, argues that while it was not named as a [*47] defendant in the criminal action, its business operations were the target of the criminal prosecution. However, plaintiff has not presented any authority, and the court has not found any, which would permit plaintiff, Craig PC, to bring a malicious prosecution claim when it was not a defendant in the criminal action. Consequently, the court finds that the malicious prosecution claim alleged by Craig PC is subject to dismissal under the OCPA.

With respect to plaintiff Craig II, the court concludes that the First Amended Complaint does not set forth sufficient facts to establish clear and specific evidence of a prima facie case for the fourth element of the malicious prosecution claim--the prosecution "has been legally and finally terminated in plaintiff's favor." Generally, a dismissal with prejudice of the original action is a favorable termination. Young v. First State Bank, Watonga, 628 P.2d 707, 709 (Okla. 1981). However, if the dismissal of the original action is procured by the defendant or a result of the agreement or compromise of the parties, there is no favorable termination. *Id.*

Here, the First Amended Complaint does not allege that the criminal prosecution against Craig II was terminated with a dismissal with prejudice. The record in the [*48] Grady County criminal case, CF-14-373, involving plaintiff Craig Sr., indicates that his original criminal case was dismissed without prejudice.[9][10] The First Amended Complaint alleges that the state moved to dismiss all charges against Craig II and "agreed in writing not to refile the charges." Doc. no. 31, ¶ 97. There is no allegation that the agreement in writing not to refile the charges was not pursuant to any agreement between Craig II and the state. Moreover, Microsoft has

---

[8] Although this is not a component of the court's "good cause" evaluation, the court cannot but note that, even though the claims addressed in this part of this order do, as a literal matter, come within the scope of the OCPA (now that the court has concluded, reluctantly, that the OCPA applies in the first instance), it is hard to imagine that these claims are the kind that the legislature had in mind when it enacted the OCPA. The classic SLAPP suit situation is one in which a powerful, well-financed corporate plaintiff uses civil litigation, perhaps with little concern about the actual merits of the litigation, as a cudgel against an individual or group engaged in the exercise of first amendment rights (usually at least arguably in the service of some broad public interest), for the purpose of chilling, or preferably completely deterring, the exercise of those rights. If there is any truth to the core allegations in the First Amended Complaint, this case does not present that situation. Far from it.

---

[9] According to the First Amended Complaint, the records involving the criminal charges against Craig II were expunged pursuant to an order of the state court.

[10] A dismissal without prejudice does not qualify as a favorable termination because it does not "reach the substantive rights of the cause of action and thereby vindicate appellant as to the underlying action." Glascow v. Fox, 757 P.2d 836, 839 (Okla. 1988).

presented a transcript of the criminal proceedings indicating that the resolution of the criminal proceedings was a "global recommendation and plea agreement" or "global plea arrangement" between the parties. Microsoft's motion, doc. no. 53, ex. N of ex. 2, p. 5.

The court, however, will permit plaintiffs to submit affidavits or other evidence, after limited discovery, if plaintiffs so choose, which establishes by clear and specific evidence that Craig II's criminal prosecution was legally and finally terminated in his favor.

Microsoft, in its motion, also challenges Craig II's ability to satisfy the fifth element of the claim, specifically, the prosecution was without probable cause. It points out that after the [*49] preliminary hearing in the criminal proceeding, the judge bound Craig II over for trial. However, an initial finding of probable cause is not conclusive. Ames v. Strain, 301 P.2d 641, 643, 644 (Okla. 1956) (recognizing the question of probable cause resolved at preliminary hearing precludes civil prosecution for false arrest except when the arresting officer is "shown to have presented the facts to the justice dishonestly, or to have . . . acted without probable cause") (quotation marks and italics omitted). Plaintiffs have sufficiently alleged facts to meet their burden under the OCPA that Microsoft's investigator and employee provided false testimony at the preliminary hearing. The court therefore concludes that dismissal is not appropriate based upon the fifth element of the malicious prosecution claim.

C. *Interference Claims*

As previously discussed, the elements of a claim for tortious interference with a contractual or business relationship are: (1) interference with an existing contractual or business right; (2) such interference was malicious and wrongful; (3) the interference was neither justified, privileged nor excusable; and (4) the interference proximately caused damage. Wilspec Technologies, Inc., 204 P.3d at 74. The elements of a claim of tortious interference [*50] with prospective economic advantage are: (1) the existence of a valid business relation or expectancy; (2) knowledge of the relationship or expectancy on the part of the interferer; (3) an intentional interference inducing or causing a breach or termination of the relationship or expectancy; and (4) resultant damage to the party whose relationship has been disrupted. Lakeshore Cmty. Hosp., Inc., 538 N.W.2d at 27.

The court concludes that the allegations in plaintiffs' First Amended Complaint do not establish by clear and specific evidence a prima facie case of "an interference with an existing contractual or business relationship" and "the interference proximately caused damage" as required for a tortious inference with contractual or business relationship claim. Plaintiffs allege that they had "a valid business relationship and expectancy" with "various school districts and private clients." First Amended Complaint, doc. no. 31, ¶ 151. Although sufficient for Rule 12(b)(6) purposes in the court's view, the court concludes that these facts are not sufficient for the "clear and specific evidence" standard. In addition, while plaintiffs allege sufficient facts with respect to the interference, *i.e.*, "false statements that Plaintiffs[] violated [*51] Microsoft's copyright in 2014 and 2015," they do not establish by clear and specific evidence how the false statements interfered with the existing contractual or business relationship and how that interference proximately caused damage to plaintiffs.

With respect to the tortious inference with prospective economic advantage claim, the court concludes that plaintiffs do not establish by clear and specific evidence a prima facie case of any of the elements of the claim. Plaintiffs do not plead specific and clear evidence of "the existence of a valid business relation or expectancy." As stated, plaintiffs have pleaded only that they had "a valid business relationship and expectancy" with "various school districts and private clients." First Amended Complaint, doc. no. 31, ¶ 151. Also, while there are allegations that Microsoft investigators were present during FBI interviews of school districts that were clients of plaintiffs and they conducted tests on computers of school districts, it is not "clear and specific" whether these school districts are the same school districts with whom plaintiffs had an existing valid business relation or expectancy of which Microsoft would have known. [*52] Further, there is no clear and specific evidence of the alleged false statements of Microsoft inducing or causing a breach or termination of the relationship or expectancy. While plaintiffs allege that the false statements interfered with the relation or expectancy, there is no clear and specific evidence as to how the false statements caused a termination of the relation or expectancy. Nor is there clear and specific evidence of the resultant damage to the plaintiffs whose relationships were purportedly disrupted.

The court, however, will permit plaintiffs to submit affidavits or other evidence, after limited discovery if plaintiffs so choose, to establish by clear and specific evidence the cited elements of their interference claims.

D. *Statute of Limitations*

Microsoft argues that plaintiffs' interference claims are barred by the applicable statute of limitations. Under the OCPA, the court must dismiss plaintiffs' claim if Microsoft establishes by a preponderance of the evidence each essential element of its defense. Microsoft has not presented any affidavits or other evidence with respect to its defense. Instead, it relies upon the allegations in plaintiffs' First Amended Complaint. [*53] The court is not convinced that the statute of limitations defense is established by a preponderance of the evidence by virtue of the allegations in plaintiffs' First Amended Complaint. Thus, the court concludes that dismissal of plaintiffs' tortious interference claims, based upon the statute of limitations, is not appropriate.

E. *Section 1983 Claim*

The OCPA does not apply to plaintiffs' Section 1983 claim. The court therefore applies the Rule 12(b)(6) standard to the claim, as previously set forth.

Initially, Microsoft argues that the § 1983 malicious prosecution claim should be dismissed because the facts alleged in the First Amended Complaint do not show it was acting under the color of state law. Section 1983 provides a claim for relief against state actors for violation of a plaintiff's federal rights. Becker v. Kroll, 494 F.3d 904, 914 (10th Cir. 2007). To state a claim under § 1983, a plaintiff must allege two essential elements: (1) a right secured by the Constitution or laws of the United States was violated, and (2) the alleged violation was committed by a person acting under the color of state law. West v. Atkins, 487 U.S. 42, 48 (1988). When a constitutional claim is asserted against a private party, it must be jointly engaged with state officials in the conduct allegedly violating the federal right in order to be classified [*54] as a state actor under color of law. Lugar v. Edmondson Oil Co., Inc., 457 U.S. 922, 931-32 and no. 15, 941. The joint action constitutes both the state action essential to establish a constitutional violation, and action under color of state law. Id. at 931-932.

According to the First Amended Complaint, the officer that Microsoft assisted in the criminal investigation was Decker, an FBI agent. "Section 1983 is not directed at conduct by federal officials." Big Cats of Serenity Springs, Inc. v. Rhodes, 843 F.3d 853, 869 (10th Cir. 2016). However, plaintiffs argue that the First Amended Complaint alleges facts to show joint action between Microsoft, Decker and the State Attorney General. Citing Lusby v. T.G.& Y. Stores, Inc., 749 F.2d 1423, 1429 (10th Cir. 1984), *vacated on other grounds*, 474 U.S.

805 (1985)), plaintiffs contend that the state carried out its criminal prosecution based upon the false information provided by Microsoft and Decker, thereby adopting Microsoft and Decker's judgment, rather than conducting an independent investigation.

In Lusby, the Tenth Circuit held that an off-duty police officer employed as a security guard was a state actor when he made a citizen's arrest for shoplifting. Lusby, 749 F.2d at 1429. The security guard told the plaintiff that "he was going to jail," and the police department provided the store that employed the security guard "with special forms prepared for merchants who detained suspected shoplifters [*55] which apparently allowed officers the discretion to issue a summons to a suspect . . . without taking the person to jail." Id. at 1429-30. Consequently, "the local police followed a policy that allowed [the security guard] to substitute his judgment for that of the police." Id. at 1430. "Such cooperative activity between the police department and a private party," the court found, was "sufficient to make [the security guard] a party acting under color of state law." Id.

No similar cooperative activity is alleged in the First Amended Complaint. Indeed, plaintiffs make no factual allegations to show that the State Attorney General failed to conduct an independent investigation and that he relied solely on the alleged false representations of Microsoft and Decker for the state criminal prosecution. The factual allegations in the First Amended Complaint do not demonstrate a "substantial degree of cooperative action" between Microsoft, Decker and the State Attorney General or "overt and significant state participation." Gallagher v. Neil Young Freedom Concert, 49 F.3d 1442, 1454 (10th Cir. 1995). In addition, the factual allegations do not show that Craig II's prosecution resulted from concerted action, such as a "prearranged plan, customary procedure, or a policy that substituted the judgment [*56] [of Microsoft for that of the State Attorney General] or that allowed [Microsoft] to exercise state power." Carey v. Continental Airlines, Inc., 823 F.2d 1402, 1404 (10th Cir. 1987). The mere furnishing of information to the state authorities, without more, does not constitute joint action under color of state law. Schaffer v. Salt Lake City Corp., 814 F.3d 1151, 1157 (10th Cir. 2016).

Joint action may be shown if Microsoft and Decker "conspire[d] with state officials to infringe a protected constitutional right." Big Cats of Serenity Springs, Inc., 843 F.3d at 869. However, the complaint must allege (1) an agreement between two or more persons, and (2) an

intent to achieve an unlawful act. *Id.* at 870. Here, there are no facts alleged to show that the State Attorney General, Microsoft and Decker had an agreement to pursue an unlawful act. There are no facts alleged to indicate they "share[d] a common, unconstitutional goal." *Gallagher*, 49 F.3d at 1454. Consequently, plaintiffs have failed to allege facts sufficient to support a plausible claim that Microsoft acted under the color of state law for purposes of § 1983 liability.

In addition to the color of law element, plaintiffs must show that Microsoft deprived plaintiffs of their constitutional rights by wrongfully prosecuting them. To do so, plaintiffs must show (1) that Microsoft caused their confinement or prosecution; (2) the original action terminated in their **[*57]** favor; (2) there was no probable cause to confine or prosecute plaintiffs; (4) malice; and (5) damages. Cordova v. City of Albuquerque, 816 F.3d 645, 650 (10th Cir. 2016) (quotation omitted).

Initially, the court finds that the First Amended Complaint does not state a plausible § 1983 malicious prosecution claim for Craig PC because there are no factual allegations that any criminal proceeding was brought against it.

The court also finds that the First Amended Complaint does not state a plausible § 1983 malicious prosecution claim as to Craig II. To be deemed favorable, a termination of prosecution "must in some way indicate the innocence of the accused." *Cordova*, 816 F.3d at 651. The court may "look to the stated reasons for the dismissal as well as to the circumstances surrounding it." *Id.* In the case at bar, the allegations in the First Amended Complaint do not reveal that the dismissal of the criminal charges indicates the innocence of Craig II. The allegations do not show that the criminal proceeding was dismissed with prejudice. They only show that the state agreed in writing not to refile the charges. However, an agreement not to refile the charges does not indicate the innocence of Craig II. "[T]he abandonment of prosecution that 'does not touch the merits . . . leaves the accused **[*58]** without a favorable termination.'" *Id.* at 651 (quoting Dan B. Dobbs *et al.*, Dobb's Law of Torts § 590 (2d ed. 2015). The court therefore concludes that the factual allegations are not sufficient to support the second element of the § 1983 malicious prosecution claim.

Plaintiffs have not requested leave to amend the § 1983 malicious prosecution claim. However, plaintiffs are being permitted to submit supporting affidavits or other evidence, if appropriate, with respect to malicious prosecution claim under Oklahoma law. If the Oklahoma malicious prosecution claim survives dismissal and plaintiffs believe they can allege sufficient facts to show Microsoft acted under the color of state law for purposes of § 1983 liability, plaintiffs may file a motion to amend the First Amended Complaint, within the time provided by the court's scheduling order. Therefore, at this stage, the court shall dismiss the § 1983 malicious prosecution claim without prejudice.

### F. *Affidavits or Specific and Limited Discovery*

Plaintiffs shall have 45 days from the date of this order to submit affidavits to establish by clear and specific evidence the prima facie case of the elements of plaintiffs' state law malicious prosecution and interference claims, **[*59]** which the court has found not supported by the allegations in the First Amended Complaint. If plaintiffs conclude that they are unable to present clear and specific evidence by way of affidavit and need to engage in discovery to accomplish it, plaintiffs shall confer in good faith with Microsoft as to the discovery (documentary or testimonial) they need. If the parties can reach an agreement on the discovery needed, plaintiffs shall file a written notice with the court of the parties' agreement. If the time needed to obtain the discovery exceeds the 45-day deadline, plaintiffs shall notify the court of the time needed. The court will enter an order setting forth a new deadline for plaintiffs to submit their affidavits or evidence, or both. If the parties are unable to reach an agreement on the issue of discovery, plaintiffs shall file a motion with the court specifying the discovery requested and the time needed to obtain it.

After plaintiffs have submitted their affidavits or evidence, or both, Microsoft shall have 45 days from the date of plaintiffs' filing to submit any opposing affidavits or evidence (obtained during plaintiffs' requested discovery). If Microsoft seeks to conduct **[*60]** discovery prior to filing its submission, Microsoft shall file a motion.

If plaintiffs do not submit any affidavits within the 45-day time period or do not file any written notice or motion as to discovery within the 45-day time period, the court will assume plaintiffs cannot satisfy their burden under OCPA with respect to the elements discussed by the court for the state law malicious prosecution and interference claims and will enter an order granting Microsoft's motion to dismiss.

### IV. *CDWG's Motion for Amended Order*

After the removal of plaintiffs' action to this court, CDWG moved to dismiss plaintiffs' original state court petition. CDWG argued that the petition should be dismissed, in part, because plaintiffs failed to serve the petition within 180 days of its filing as required by Oklahoma law and they failed to show good cause for not serving it within the 180-day time period. CDWG pointed out that plaintiffs requested and obtained seven extensions of the service period without showing good cause why service was not made. CDWG argued that plaintiffs used the service statute to subvert the statute of limitations and effectively stayed the case until it suited them. CDWG requested [*61] dismissal under Rule 12(b)(5), Fed. R. Civ. P., based upon the nearly three-year delay of service of process and under Rule 12(b)(6), Fed. R. Civ. P., based upon the statute of limitations.

On March 30, 2017, the court entered an order denying CDWG's motion to the extent it sought dismissal under Rule 12(b)(5) for the nearly-three year delay of service of process and under Rule 12(b)(6) based upon the statute of limitations. Although the court recognized that it may dissolve or alter prior state court orders after removal, the court declined to alter the state court rulings granting the extensions of time to obtain service of process. Quoting Palzer v. Cox Oklahoma Telecom, LLC, 671 Fed. Appx. 1026, 1028, 2016 WL 6818839, at *2 (10th Cir. Nov. 18, 2016), the court stated that it "does not take lightly the notion that [defendant] can avoid this suit in federal court after the state court expressly allowed the case to proceed, whether its decision amounted to good cause finding or not." Id. CDWG now requests the court to amend its March 30, 2017 order to allow CDWG to immediately appeal the ruling.

Under 28 U.S.C. § 1292(b), the court may certify an interlocutory appeal if "such order involves a controlling question of law as to which there is substantial ground for difference of opinion and that an immediate appeal from the order may materially advance the ultimate termination of the litigation."

[*62] Upon review, the court concludes that CDWG has failed to establish the requisite element of "substantial ground for difference of opinion." "Courts traditionally will find that a substantial ground for difference of opinion exists where the circuits are in dispute on the question and the court of appeals of the circuit has not spoken on the point, if complicated questions arise under foreign law, or if novel and difficult questions of first impression are presented." Couch v. Telescope

Inc., 611 F.3d 629, 633 (9th Cir. 2010) (quoting 3 Federal Procedure, Lawyers Edition § 3:212 (2010) and omitting footnotes). However, "just because counsel contends that one precedent rather than another is controlling does not mean there is such a substantial difference of opinion as will support an interlocutory appeal." Id. CDWG, in its motion, does not address whether a substantial ground for difference of opinion exists. For the first time in reply, CDWG asserts that a substantial ground for difference of opinion does exist. CDWG contends that a substantial ground for difference of opinion exists because the district court in the Palzer case found it appropriate to conduct a de novo review of the state court's "good cause" findings and this court declined to conduct such review.

The court need not address an issue raised for the first time in reply. Stump v. Gates, 211 F.3d 527, 533 (10th Cir. 2000). Nonetheless, even if the court should address it, the court finds that simply because the district court in the Palzer decided to address the state court's "good cause" finding de novo and found that the plaintiff failed to establish good cause does not establish a substantial ground for difference of opinion with this court's order. Moreover, the court notes that the Tenth Circuit reversed the district court's order, finding that the court abused its discretion in dismissing the suit instead of giving [*63] plaintiff the opportunity to effect service under federal law. Palzer, 617 Fed. Appx. at 1028. As the district court's ruling was reversed, the court cannot conclude that it constitutes controlling authority. Moreover, the court notes that CDWG does not address in its reply how a substantial ground for difference of opinion exists with respect to the court's Rule 12(b)(6) ruling. Because CDWG has not established that a substantial difference of opinion exists with respect to the court's order, the court concludes that certification of the court's March 30, 2017 order for interlocutory appeal is not appropriate.

## V. Conclusion

Based upon the foregoing,

CDW Government, LLC's Motion to Dismiss Plaintiff's First Amended Complaint (doc. no. 52) is **DENIED** and CDW Government, LLC's Motion for Amended Order (doc. no. 65) is **DENIED**.

Defendant Microsoft Corporation's Motion to Dismiss Pursuant to the Oklahoma Citizens Participation Act, Okla. Stat. tit. 12, § 1430, et seq., and Fed. R. Civ. P. 12(b)(6) (doc. no. 53) is **GRANTED** with respect to "Plaintiffs Craig PC and Craig, II's Fifth Cause of Action

Against Microsoft - For Malicious Prosecution in Violation of the United States Constitution." That cause of action is **DISMISSED WITHOUT PREJUDICE**.

Defendant Microsoft Corporation's Motion to Dismiss Pursuant **[\*64]** to the Oklahoma Citizens Participation Act, Okla. Stat. tit. 12, § 1430, *et seq.*, and Fed. R. Civ. P. 12(b)(6) (doc. no. 53) is **HELD** in **ABEYANCE** with respect to "Plaintiffs Craig PC and Craig, II's Fourth Cause of Action Against Microsoft - For Malicious Prosecution in Violation of Oklahoma Law" and "Plaintiffs Craig PC, Craig, Sr. and Craig, II's Sixth Cause of Action Against Microsoft - Intentional Interference With Contractual Relations and Prospective Economic Advantage," pending further submissions by plaintiffs and defendant as set forth in this order. If further submissions are not filed, the court shall proceed with ruling on defendant's motion without further notice.

IT IS SO ORDERED this 30th day of April, 2018.

/s/ Stephen P. Friot

STEPHEN P. FRIOT

UNITED STATES DISTRICT JUDGE

◆ Positive
As of: May 3, 2021 2:15 PM Z

# Davis v. PMA Cos.

United States District Court for the Western District of Oklahoma

March 7, 2013, Decided; March 7, 2013, Filed

Case No. CIV-11-359-C

**Reporter**
2013 U.S. Dist. LEXIS 31435 *; 2013 WL 866893

J. MARK DAVIS, Plaintiff, vs. PMA COMPANIES, INC., Defendant.

**Prior History:** Davis v. PMA Cos., 2011 U.S. Dist. LEXIS 80537 (W.D. Okla., July 22, 2011)

## Core Terms

notice, contracts, summary judgment, material breach, good faith, resignation, subsidiary, tortious breach of contract, special relationship, good reason, breached, tortious, parties, Stock

**Counsel:** [*1] For J Mark Davis, Plaintiff: Cary E Hiltgen, Michael W Brewer, Scott C Sublett, Hiltgen & Brewer, Oklahoma City, OK.

For PMA Companies Inc, Defendant: Courtney L Bru, Kenneth T Short, Kristen L Brightmire, Tom Q Ferguson, Doerner Saunders Daniel & Anderson- TULSA, Williams Center Tower II, Tulsa, OK.

**Judges:** ROBIN J. CAUTHRON, United States District Judge.

**Opinion by:** ROBIN J. CAUTHRON

## Opinion

### MEMORANDUM OPINION AND ORDER

Now before the Court is Defendant's Motion for Summary Judgment (Dkt. No. 57). For reasons for fully set forth herein, the Court now GRANTS Defendants' Motion IN FULL.

### I. BACKGROUND

In 2007, Defendant PMA Companies, Inc. ("PMA") entered into a Stock Purchase Agreement ("SPA") with Charles C. Caldwell, Thomas G. Hamill, Colin D. O'Connor, and J. Mark Davis (collectively, "the Sellers"). Through the SPA, PMA purchased from the Sellers all of the shares of Midlands Holding Company, the sole owner of Midlands Management Corporation ("MMC"). Although the Sellers received an initial cash payment for their shares, the SPA provided an opportunity to earn additional payments, conditioned on MMC's performance over the next several years. If MMC met the Adjusted Earnings Before Interest earned, Taxes, Depreciation, [*2] and Amortization ("EBITDA") [1] targets set forth in § 2.4(c)-(e) of the SPA, the Sellers had the opportunity to receive Earn-Out Payments, an Aggregate Look-Back Payment, and a Cumulative Incentive Payment. Under the SPA, PMA covenanted to "cause MMC to continue to operate in a manner consistent with its past practice, policies and operations prior to the Closing Date" and "exercise its business judgment in a manner that is consistent with MMC and

---

[1] Under the SPA, "Adjusted EBITDA" "means MMC's audited consolidated earnings before taking into account any interest expense, income taxes, depreciation, and amortization for the applicable period." (Def.'s Br., Dkt. No. 57, Ex. 1 at 4.)

Sellers' efforts to achieve the Adjusted EBITDA that is required for Sellers to receive the Earn-Out Payments, the Aggregate Look-Back Payment and the Cumulative Incentive Payment." (Def.'s Br., Dkt. No. 57, Ex. 1 at 34, 35.)

Prior to the SPA, Plaintiff Davis served as Executive Vice President of MMC. In connection with PMA's stock purchase, MMC entered into a new, amended Employment Agreement with Davis whereby MMC agreed to employ Davis as Executive Vice President from October 1, 2007, until September 30, [*3] 2011. However, on December 12, 2010, Davis resigned for "Good Reason," citing conduct constituting a material change in his duties, authorities, or responsibilities and a material breach by MMC of its obligations under the Employment Agreement. In the event of a resignation for good reason, the Employment Agreement required MMC to pay Davis a severance package if Davis signed and did not revoke a valid general mutual release agreement. Davis did not execute the required release and MMC has not made any severance payments to Davis.

Davis filed the present suit on April 1, 2011, alleging that (1) PMA breached the SPA by (a) failing to exercise its business judgment in a manner consistent with Davis's efforts to achieve the conditional bonus payments and (b) operating MMC in a manner inconsistent with its past practices, policies, and operations; (2) PMA intentionally interfered with the Employment Agreement between Davis and MMC; (3) PMA breached the duty of good faith by acting to prevent Davis from achieving the additional payments; and (4) constructively discharged Davis by controlling MMC and creating intolerable employment conditions. [2] Defendant has moved for summary judgment on all [*4] four of Plaintiff's causes of action.

## II. LEGAL STANDARD

Summary judgment is proper if the moving party "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is material if it affects the disposition of the substantive claim. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 106 S. Ct. 2505, 91 L.

Ed. 2d 202 (1986). The party seeking summary judgment bears the initial burden of demonstrating the basis for its motion, and identifying those portions of "'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,'" that demonstrate the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986) (citation omitted). If the movant satisfactorily demonstrates an absence of genuine issue of material fact with respect to a dispositive issue for which the non-moving party will bear the burden of proof at trial, the non-movant must then [*5] "go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" Id. at 324. A court considering a summary judgment motion must view the evidence and draw all reasonable inferences therefrom in the light most favorable to the nonmoving party. Kendrick v. Penske Transp. Servs., Inc., 220 F.3d 1220, 1225 (10th Cir. 2000).

## III. DISCUSSION

### A. Count I: PMA's Breach of the Stock Purchase Agreement

Davis's breach of contract claim alleges that PMA breached §§ 7.5(a)(i) and (iii) of the SPA. PMA argues that regardless of whether its actions constituted a breach, summary judgment is appropriate because Davis did not follow the proper notice procedure before bringing suit, meaning he has not established an express condition precedent. Additionally, PMA asserts that Oklahoma does not recognize "tortious breach" under the circumstances of this case.

### 1. Section 7.5 Notice

Section 2.5 of the SPA provides a remedy in the event that PMA commits a material breach of § 7.5(a)(i) or (iii) and that breach "is not [*6] cured or resolved by the procedures set forth in such Section." (Def.'s Br., Ex. 1 at 14.) The procedure necessary to trigger § 2.5's remedy is found in § 7.5(b). (Id. at 35.) Under § 7.5(b), the "Sellers shall give [PMA] written notice of any respect in which the Sellers believe that any change made by [PMA] constitutes a material breach of its

---

[2] Davis's Complaint also contained two other counts, brought against MMC only. However, the Court dismissed MMC as a non-diverse, dispensable party upon Plaintiff's request. (Order of July 22, 2011, Dkt. No. 25.)

obligations set forth in this Section 7.5." (Id.) Among other requirements, the Section 7.5 Notice must "be given promptly and in any event within ten (10) days following the date that the Sellers shall have Knowledge that such change has been made or the date upon which the Sellers have been advised by [PMA's] chief executive officer that such change will be made." (Id.) Although PMA acknowledges that Davis sent it a purported Section 7.5 Notice on November 12, 2010, PMA contends that notice was deficient in two respects: (1) it was not from "Sellers," collectively, and (2) it was not timely.

Section 7.5(b) directs the "Sellers" to give PMA proper notice, not an individual Seller. The SPA defines and distinguishes between "Sellers" and a "Seller" in its very first paragraph:

> THIS STOCK PURCHASE AGREEMENT is made as of the 1st day of October, [*7] 2007, by and among PMA CAPITAL CORPORATION, a Pennsylvania corporation (the "Buyer"), CHARLES C. CALDWELL ("Caldwell"), THOMAS G. HAMILL ("Hamill"), COLIN J. O'CONNOR ("O'Connor") and J. MARK DAVIS ("Davis") (collectively the "Sellers," and, individually, a "Seller") and Midlands Holding Corporation, an Oklahoma corporation, solely for the purpose of Section 2.7.

(Def.'s Br., Ex. 1 at 1 (emphasis added).) Thus, under the SPA, Davis alone is a "Seller," whereas Davis, Hamill, Caldwell, and O'Connor together comprise the "Sellers." Because only Davis sent the Section 7.5 Notice, Defendants contend it did not come from Sellers, as required by § 7.5(b).

In response, Davis argues that § 7.5(b) does not require collective notice, relying on a constructive provision in § 1.1. Section § 1.1(c) provides that "[d]efinitions shall be equally applicable to both the singular and plural forms of the terms defined, and references to the masculine, feminine or neutral gender shall include each other gender." However, "it is well established under the generally applicable rules governing contract interpretation that specific provisions . . . take precedence over more general provisions." Cogswell v. Merrill Lynch, Pierce, Fenner & Smith Inc., 78 F.3d 474, 480 (10th Cir. 1996) [*8] (citing Mutual Life Ins. Co. v. Hill, 193 U.S. 551, 558, 24 S. Ct. 538, 48 L. Ed. 788 (1904)). The express language distinguishing between Seller and Sellers takes precedence over a general canon of construction.

Moreover, the collective nature of § 2.5's remedy

clarifies why § 7.5(b) requires notice from all the Sellers, collectively. Section 2.5, once triggered, requires PMA to "pay [all] Sellers in cash the sum of the maximum amount of the Earn-Out Payments and the Cumulative Incentive Payment that could have been earned." (Def.'s Br., Ex. 1 at 15.) In contrast, the individual remedy provided by § 8.3 requires only individual action. Under § 8.3, PMA will "indemnify each Seller" for "any and all Losses arising from or related to . . . any material breach, non-fulfillment or violation of any covenant or agreement made by [PMA] in [the SPA]." (Id., Ex. 1 at 37.) To seek individual indemnification, § 8.7 requires only individual notice from the party claiming a loss.

Davis makes one final argument against PMA's assertion that he did not comply with § 7.5(b), claiming that even if § 7.5(b) required collective notice, a subsequent email from another Seller remedied the problem, bringing the Sellers into substantial [*9] compliance. On December 17, 2010, Thomas Hamill sent an email stating, "'I want to preserve whatever rights we Sellers may have.'" (Pl.'s Resp., Dkt. No. 63, at 12 & Ex. 8.) However, Hamill's December email is not sufficient to satisfy § 7.5(b)'s condition precedent of adequate notice: it was not from all the Sellers, it did not describe with particularity a material breach, nor did it ask PMA to take any particular action. Thus, there was no substantial compliance. Because the Sellers collectively did not give adequate notice under § 7.5(b), § 2.5's remedy is not applicable. [3]

## 2. Exclusivity

Davis argues that regardless of whether he complied with § 7.5(b), summary judgment on his breach of contract claim is inappropriate because § 2.5's remedy is not exclusive. It is true that § 2.5 is not the only remedy available to Davis. Section 8.3 also provides a remedy—indemnification. However, Davis has not sought indemnification under § 8.3 or followed § 8.7's corresponding claim procedure. Moreover, [*10] § 8.11, entitled "Exclusive Remedy," states that "[e]xcept for Sellers' rights under Section 2.5, the rights to indemnification provided for in this Section 8 shall constitute the exclusive remedy of . . . Sellers . . . with respect to matters in any way relating to this Agreement or arising in connection herewith, whether under any

---

[3] PMA also argues that Davis's Section 7.5 Notice was untimely. However, because the Court agrees that § 7.5 required collective notice, it need not address whether the faulty notice was timely.

laws, at common law or otherwise." (Def.'s Br., Ex. 1 at 39 (emphasis added).) Section 8.11 clearly establishes that disgruntled Sellers like Davis have two remedies in the event of a material breach: § 2.5's collective remedy or § 8.3's individual indemnification.

### 3. Tortious Breach of Contract

In his Complaint, Davis alleged not only that PMA breached the SPA, but that it "tortiously breached the Stock Agreement." However, "tort claims for a contemporaneous breach of contract are generally not permitted under Oklahoma law." KT Specialty Distribution, LLC v. Xlibris Corp., Case No. 08-CV-0249-CVE-SAJ, 2008 U.S. Dist. LEXIS 68849, 2008 WL 4279620, at *3 (N.D. Okla. Sept. 11, 2008). Oklahoma courts recognize tortious breach of contract only in limited circumstances, such as in the context of certain special relationships. See Rodgers v. Tecumseh Bank, 1988 OK 36, 756 P.2d 1223, 1225-27 [*11] (declining to extend tortious breach of contract cause of action recognized in Christian v. Am. Home Assurance Co., 1977 OK 141, 577 P.2d 899; distinguishing insurance contracts as adhesion contracts, made for the purpose of eliminating risk, and involving a special relationship). Because the SPA, like the contract in Rodgers, is the product of an arms-length transaction and there is no special relationship between PMA and Davis, PMA cannot be liable for tortious breach of contract.

### B. Count II: PMA's Interference with the Employment Agreement

Count II of Davis's Complaint asserts that "PMA intentionally interfered with the Employment Agreement by improperly and unfairly circumventing Davis' authority, purposely ensuring Davis could not fully perform his duties under the Employment Agreement." (Compl., Dkt. No. 1, at 7, ¶ 31.) Under Oklahoma law, to establish a claim of tortious interference with a contractual or business relationship, a plaintiff must prove: "(1) the interference was with an existing contractual or business right; (2) such interference was malicious and wrongful; (3) the interference was neither justified, privileged nor excusable; and (4) the interference proximately [*12] caused damage." Wilspec Techs., Inc. V. DunAn Holding Grp., Co., Ltd., 2009 OK 12, ¶ 15, 204 P.3d 69, 74. Especially pertinent to this case, "the claim is viable only if the interferor is not a party to the contract or business relationship." Id.

The Oklahoma Supreme Court has not answered whether a parent corporation is party to the contracts or business relationships of its subsidiaries. However, the Oklahoma Court of Civil Appeals recently addressed that question in Hawk Enterprises, Inc. v. Cash America International, Inc., 2012 OK CIV APP 66, 282 P.3d 786. In Hawk, the court held that there was no per se rule preventing parent corporations from being held liable for tortious interference with the contracts of their subsidiaries. Id. ¶ 19, 292 P.3d at 794. Rather, courts must determine whether a particular parent can be liable "on a case by case basis, analyzing the factors provided in the Restatement [(Second) of Torts § 767]." Id.

Focusing on the last of § 767's seven factors, the relationship between the parties, the Hawk court reversed summary judgment and remanded the case for additional proceedings. In analyzing whether the parent-defendant was a stranger to the contract between [*13] its subsidiary and the plaintiff, the court looked both at the nature of the underlying agreement—a franchise contract between the plaintiff and the subsidiary, for which the parent had signed a guaranty—and the relationship of the parent and subsidiary. Emphasizing that "the exact relationship between [the subsidiary] and the [parent-defendant] [was] not fully developed in this record," meaning it was unclear whether the parent wholly or only partially owned the subsidiary and the extent of the decision-making authority and control of the parent over the subsidiary, the court directed the parties to address those "material" issues on remand. Id. ¶¶ 20-22, 292 P.3d at 795.

Unlike in Hawk, the relationship between the parties in this case is clear. Not only does PMA wholly own MMC, the SPA expressly gave PMA control over MMC by granting PMA three of the five positions on MMC's Board of Directors. Moreover, the contracts involved in this matter are different than those at issue in Hawk. PMA is not just a guarantor of one party's obligations to another agreement. In contrast, the Employment Agreement between MMC and Davis came about as a result of the SPA between PMA and Davis. Given the [*14] nature of the contracts and PMA's control over MMC, PMA is a party to the Employment Agreement. Thus, since the alleged interferor—PMA—is not a stranger or third-party, Davis cannot maintain a cause of action for tortious interference. [4]

---

[4] The Court does not find it necessary to address PMA's alternative argument that Davis cannot establish an interference with a contractual right.

2013 U.S. Dist. LEXIS 31435, *14

C. Count III: PMA's Breach of the Duty of Good Faith

Davis's third cause of action alleges he "has been damaged by PMA's breach of its duty of good faith under the [SPA]." (Compl. at 7, ¶ 37.) Oklahoma recognizes the "obligation to exercise good faith and fair dealing." First Nat'l Bank & Trust Co. of Vinita v. Kissee, 1993 OK 96, ¶ 24, 859 P.2d 502, 509. However, generally, "a breach of the implied covenant of good faith and fair dealing merely results in a breach of contract," not an independent tort. Id. Only in special circumstances has the Oklahoma Supreme Court recognized a claim for tortious breach of contract based on the implied duty of good faith. See, e.g., Rodgers, 1988 OK 36, 756 P.2d at 1225-27 (refusing to extend duty to commercial loan contracts); RJB Gas Pipeline Co. v. Colo. Interstate Gas Co., 1989 OK CIV APP 100, ¶ 58, 813 P.2d 1, 11 [*15] (declining to extend duty to private take-or-pay gas purchase contracts).

For example, in Rodgers, the Oklahoma Supreme Court refused to extend the implied duty of good faith and fair dealing—recognized in the context of insurance agreements—to commercial loan contracts "because of the inherent differences between insurance policies and commercial loan agreements." Rodgers, 1988 OK 36, ¶ 13, 756 P.2d at 1227. Unlike other contracts, insurance policies are adhesion contracts that involve a special relationship and are entered into for the purpose of eliminating risk. Id. at 1226-27. Thus, the court held, "[w]here, as here, there is no special relationship, parties should be free to contract for any lawful purpose and upon such terms as they believe to be in their mutual interest. To impose tort liability . . . for every breach of contract would only serve to chill commercial transactions." Accordingly, only when the facts indicate "[g]ross recklessness or wanton negligence" might a remedy in tort be available. Id., 1988 OK 36, 756 P.2d at 1226, ¶ 16.

Davis relies on Beshara v. Southern National Bank, 1996 OK 90, 928 P.2d 280, for an example of a case in which the Oklahoma Supreme Court [*16] recognized a bad faith tort in the context of a commercial contract. In Beshara, the plaintiff alleged that his bank withheld the funds in his account in an intentional and malicious manner, and in reckless and wanton disregard for his rights as a customer. 1996 OK 90, 928 P.2d at 288. Viewing all inferences in the plaintiff's favor, the court reversed summary judgment in favor of the defendant and held that the plaintiff "should have been allowed the opportunity to proceed on his allegations for tortious

breach of the duty of good faith and fair dealing." Id. at 1996 OK 90, ¶ 28, 928 P.2d at 288. However, this case is more reminiscent of RJB Gas Pipeline, where "[t]he parties' relationship was founded on contracts agreed to at arms length between the parties, both of which are experienced in their fields." 1989 OK CIV APP 100, ¶ 59, 813 P.2d at 12. PMA's actions did not amount to gross negligence or reckless disregard of Davis's rights under the SPA.

D. Count VI: PMA's Wrongful Termination/Constructive Discharge

Finally, Davis contends that PMA, acting through MMC, forced him to resign by making his working conditions intolerable. When an employer "intentionally ma[kes] or allow[s] [*17] the employee's working conditions to become so intolerable that a reasonable person in the employee's situation would feel that [he] had no choice but to quit," the employer can be held liable for "constructive discharge." OUJI CIV 21.8. Here, Davis claims that he had to give MMC notice of material breach of the Employment Agreement because of PMA's actions. Section 6(f)(iv) of the Employment Agreement permitted Davis to resign for "Good Reason" if MMC committed a material breach of any of its obligations to Davis under the Employment Agreement. (Def.'s Br., Ex. 4 at 4.) Resigning for good reason under § 6(f) entitled Davis to the generous severance package described in § 7(b). However, in order to trigger MMC's obligation to pay severance compensation, David had to first sign a valid general mutual release, as required by § 7(b)(iv) of the Employment Agreement. Davis argues that he should receive compensation for his resignation notwithstanding § 7(b)(iv)'s release requirement because MMC's breach of the Employment Agreement relieved Davis from complying with any of its provisions. This logic ignores the fact that Davis agreed to all of the provisions in the Employment Agreement, [*18] including the requirement that he sign a release to obtain severance compensation in the event of a voluntary resignation for "Good Reason," or a resignation resulting from MMC's material breach. Therefore, summary judgment on Davis's constructive discharge claim is appropriate.

IV. CONCLUSION

Accordingly, the Court hereby GRANTS IN FULL Defendant's Motion for Summary Judgment (Dkt. No. 57). Judgment will be entered in favor of Defendant

2013 U.S. Dist. LEXIS 31435, *18

PMA Companies, Inc. Plaintiff's Motion for Partial Summary Judgment (Dkt. No. 56) is thus MOOT. All remaining pending motions are stricken as moot.

IT IS SO ORDERED this 7th day of March, 2013.

/s/ Robin J. Cauthron

ROBIN J. CAUTHRON

United States District Judge

**End of Document**

 Neutral

As of: May 3, 2021 2:16 PM Z

# Hammond v. Lyndon Southern Ins. Co.

United States District Court for the Western District of Oklahoma

August 19, 2020, Decided; August 19, 2020, Filed

Case No. CIV-19-245-D

**Reporter**

480 F. Supp. 3d 1265 *; 2020 U.S. Dist. LEXIS 150156 **; 2020 WL 4820720

KYLI HAMMOND, Plaintiff, v. LYNDON SOUTHERN INSURANCE COMPANY, et al., Defendants.

**Prior History:** Hammond v. Lyndon Southern Ins. Co., 2019 U.S. Dist. LEXIS 199642 (W.D. Okla., Nov. 18, 2019)

## Core Terms

cancellation, coverage, reinstatement, notice, summary judgment, insurance policy, insurance claim, tortious interference, cancellation notice, insured, matter of law, handling, premium, material fact, nonpayment of premium, installment payment, insurance contract, genuine

**Counsel:** [**1] For Kyli Hammond, Plaintiff: Jason J Waddell, LEAD ATTORNEY, Jason Waddell PLLC, Oklahoma City, OK.

For Lyndon Southern Insurance Company, Defendant: Lori Christine B McInnes, Michael G McAtee, McAtee & Woods, Oklahoma City, OK.

For Jupiter Managing General Agency Inc, Defendant: Lori Christine B McInnes, Michael G McAtee, LEAD ATTORNEYS, McAtee & Woods, Oklahoma City, OK.

**Judges:** TIMOTHY D. DeGIUSTI, Chief United States District Judge.

**Opinion by:** TIMOTHY D. DeGIUSTI

## Opinion

**[*1267] ORDER**

Before the Court are Plaintiff's Motion for Partial Summary Judgment [Doc. No. **[*1268]** 43] and Defendants' Motion for Partial Summary Judgment [Doc. No. 47], filed pursuant to Fed. R. Civ. P. 56 and LCvR56.1. Plaintiff seeks a determination of a discrete issue: whether "the cancellation of her insurance policy by Defendants was improper as a matter of law." See Pl.'s Mot. at 1. Defendants seek a judgment in their favor on Plaintiff's tort claims of insurer's bad faith, fraud, and tortious interference with contract. Both Motions are fully briefed and at issue. See Defs.' Resp. Br. [Doc. No. 52]; Pl.'s Resp. Br. [Doc. No. 53]; Pl.'s Reply Br. [Doc. No. 54].

**Factual and Procedural Background**

Plaintiff Kyli Hammond brings suit to recover damages for an alleged breach of contract [**2] by Defendant Lyndon Southern Insurance Company ("Lyndon") due to its denial of an insurance claim under an automobile insurance policy. She also claims that Lyndon and Defendant Jupiter Managing General Agency, Inc. ("Jupiter"), which administered the policy, breached a duty of good faith and fair dealing in handling the insurance claim. Plaintiff further claims that Jupiter tortiously interfered with the insurance contract and engaged in fraudulent conduct in administering the policy and handling the claim. The case was filed in

480 F. Supp. 3d 1265, *1268; 2020 U.S. Dist. LEXIS 150156, **2

state court and timely removed based on federal diversity jurisdiction.

This is not a typical insurance case. Before removal, Defendants filed a joint answer in which they admitted Plaintiff suffered a covered loss, a breach of contract occurred, and Plaintiff's insurance claim "should have been handled differently." *See* Answer [Doc. No. 4-1], ¶¶ 8, 10, 13, 15, 20-22. Further, in the Joint Status Report filed before the initial scheduling conference, the parties stipulated to the following facts: Plaintiff was involved in a single-car **[*1269]** accident on July 19, 2017; she had an insurance policy with Lyndon that included collision and comprehensive coverage for the **[**3]** vehicle involved in the accident; Jupiter was responsible for administering the policy, payments, notices, and claims; the policy was in full force and effect at the time of the accident; Plaintiff reported the loss to Defendants and initiated a claim; Lyndon denied coverage for the loss but later withdrew the denial; Lyndon breached the insurance contract; and Jupiter charged Plaintiff "reinstatement fees" for alleged lapses in coverage. *See* Joint Status Report [Doc. No. 10] at 3, ¶ 3. Other material facts are also undisputed, as discussed *infra*. Given this agreement, the parties seek summary judgment rulings on several issues.

### Standard of Decision

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A material fact is one that "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986). A dispute is genuine if the facts and evidence are such that a reasonable juror could return a verdict for either party. *Id.* at 255. All facts and reasonable inferences must be viewed in the light most favorable to the nonmovant. *Id.*

A movant bears the initial burden of demonstrating the absence **[**4]** of a dispute of material fact warranting summary judgment. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986). If the movant carries this burden, the nonmovant must then go beyond the pleadings and "set forth specific facts" that would be admissible in evidence and that show a genuine issue for trial. *See Anderson*, 477 U.S. at 248; *Celotex*, 477 U.S. at 324. "To accomplish this, the facts must be identified by reference to affidavits, deposition transcripts, or specific exhibits

incorporated therein." *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 671 (10th Cir. 1998); *see* Fed. R. Civ. P. 56(c)(1)(A). "Cross-motions for summary judgment are treated as two individual motions for summary judgment and held to the same standard, with each motion viewed in the light most favorable to its nonmoving party." *Banner Bank v. First Am. Title Ins. Co.*, 916 F.3d 1323, 1326 (10th Cir. 2019). The inquiry is whether there is a need for a trial - "whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson*, 477 U.S. at 251.

### Undisputed Facts

Along with the stipulated facts, additional facts are established by the summary judgment record. Plaintiff purchased the insurance policy on April 4, 2017, to cover her vehicle for a six-month period by making an initial premium payment and agreeing to make five installment payments due on the fourth day of each month. **[**5]** During each of the next three months, Plaintiff failed to make a timely payment (May 4, June 4, and July 4), but she did make late installment payments (May 16, June 10, and July 14). Each month, Jupiter mailed Plaintiff a billing notice (stating an installment number, payment amount, and due date), a cancellation notice (stating the policy would be cancelled if payment was not received by a later date - May 12, June 10, and July 10), and a reinstatement notice (stating the policy had been reinstated upon payment - May 17, June 11, and July 15).

**[*1270]** Each of the cancellation notices was sent before the deadline to make an installment payment had passed; the notices warned that coverage would be cancelled for nonpayment by a cancellation date and, if cancellation occurred, a $15 reinstatement fee would be required to reinstate coverage.[1] Each time Plaintiff missed a payment deadline, the policy was terminated

---

[1] For example, the first cancellation notice was dated April 30, 2017, requested payment of the installment amount "by the cancellation date," and stated: "If you fail to pay the Total Amount Due before May 12, 2017, your insurance coverage will be cancelled effective 12:00 AM STANDARD TIME on May 12, 2017." *See* Defs.' Mot., Ex. 3 [Doc. No. 47-3] (emphasis omitted); *see also id.* Ex. 6 [Doc. No. 47-6] (identical form with cancellation date of June 10, 2017), Ex. 9 [Doc. No. 47-9] (identical form with cancellation date of July 10, 2017).

Case 5:22-cv-00977-SLP    Document 21-2    Filed 01/24/23    Page 54 of 65

Page 3 of 7

480 F. Supp. 3d 1265, *1270; 2020 U.S. Dist. LEXIS 150156, **5

on the cancellation date (May 12, June 10, and July 10), and a $15 fee was assessed. Each cancellation date was less than 10 days after an installment was due, even though the policy required 10 days' notice to cancel for nonpayment of premiums.

Within days after the third **[**6]** reinstatement notice, Plaintiff had a single-car accident in the insured vehicle on July 19, 2017, and promptly submitted an insurance claim.[2] Jupiter immediately mailed a reservation of rights letter, stating "there is a potential coverage problem" and "[t]his loss requires further investigation." *See* Def.'s Mot., Ex. 11 [Doc. No. 47-11]. Specifically, "[a] preliminary review of your policy indicates that the above mention [sic] loss occurred within 5 DAYS after your policy reinstated. Your policy cancelled on 07/10/17 and reinstated effective 07/15/17." *Id.* (emphasis in original).

Plaintiff contacted Jupiter by telephone on July 25, 2017, about submitting a photograph taken at the scene of the accident to prove the date of loss. Plaintiff submitted the photo the next day, but it lacked a date stamp. On August 18, 2017, Jupiter's claim adjuster recommended a "soft denial" of the claim "pending proof of date of loss within [the] coverage period;" Jupiter's claim file contains notes stating that Plaintiff had not provided such proof - "no towing[,] no police report[,] photo taken, however no timestamp to confirm date and time of loss." *See* Def.'s Mot., Ex. 12 at 3 (8/18/17 entry). A supervisor **[**7]** approved the recommendation on August 23, 2017, and a denial letter was sent to Plaintiff on August 24, 2017.

Despite the recommended "soft denial" (a term which is not explained by the record), Plaintiff received a letter that stated in full:

Dear Sirs/Madam:

The investigation of the above captioned matter has been completed and after careful examination of the circumstances surrounding this accident, we believe there is sufficient evidence at this time to make a proper decision regarding this claim. After further review of your policy there is indication that

the above mention [sic] loss occurred within 10 days of your policy's inception, renewal, reinstatement or coverage changes.

After thorough investigation and review regarding the information surrounding this loss we unfortunately must respectfully decline to provide coverage for this loss. Neither the insured or the claimant **[*1271]** provided evidence that this loss occurred within the policy period.

Please contact the undersigned should you have any additional information regarding this claim. Should you have any information which would affect this decision please contact this office immediately.

Defs.' Mot., Ex. 13 [Doc. No. 47-13].

The vehicle **[**8]** was also covered by an insurance policy related to a car loan, and the lender made a claim under its policy after Defendants denied coverage. Securian Casualty Company paid the lender $10,966.06 in settlement of the claim in October 2017. Plaintiff filed this action in December 2017.[3]

**Discussion**

**A. Defendants' Cancellation of the Policy**

Plaintiff seeks a ruling on whether Defendants properly cancelled the policy. She asserts Oklahoma law is clear that an anticipatory or conditional notice of cancellation - issued before an incident of nonpayment has occurred - is legally insufficient to permit cancellation of a policy that requires prior notice. *See* Pl.'s Mot. at 4-8. Plaintiff relies on two Oklahoma Supreme Court decisions as dispositive of the issue: *Equity Insurance Co. v. City of Jenks*, 2008 OK 27, 184 P.3d 541 (Okla. 2008); and *Equity Insurance Co. v. St. Clair*, 2008 OK 79, 196 P.3d 981 (Okla. 2008). Although not entirely clear, the Court understands that Plaintiff seeks a resolution of this issue in order to advance her claim that Defendants engaged in bad faith conduct by relying on a lapse in coverage to deny the insurance claim, and to recover the amount of

---

[2] Defendants state that this was Plaintiff's second claim, that her first claim was made within the first month of coverage due to a tree falling on the vehicle, and that Jupiter promptly paid the claim. Although Plaintiff does not dispute these facts, Defendants provide no evidentiary support for them, and their relevance to the issues presented is unclear. Thus, they are disregarded.

[3] Defendants also present evidence, which is undisputed, that Plaintiff stated in September 2017 that she was preparing to seek bankruptcy protection, and Plaintiff later filed a voluntary bankruptcy petition in June 2018 (while this case was pending in state court). Defendants do not explain the relevance of these facts, which postdate the denial of coverage.

reinstatement fees that were charged. *See* Pl.'s Mot. at 10; Reply Br. at 1, 4.

In response, Defendants first argue that the cancellation issue is "irrelevant" because [**9] "the date of loss occurred on a date coverage was in force and effect." *See* Defs.' Resp. Br. at 2. This argument seems to focus on Plaintiff's breach of contract claim; Defendants concede "[t]he fact that the accident happened so close to a lapse in coverage is one of the reasons why the claim was initially denied." *Id.* at 3. Logically, this concession means the issue is relevant to the handling of Plaintiff's insurance claim and the denial of coverage. Regarding reinstatement fees, Defendants point out that Plaintiff's cited cases do not address whether an insurer can properly assess a fee for an insured's untimely payment of a premium installment. Defendants argue that "[a] consequence [of] not making premium payments when due is the imposition of a $15 reinstatement fee that Plaintiff agreed to when she took out the policy." *Id.* at 4.

Upon consideration, the Court finds that the issue of improper cancellation of insurance coverage under the policy is directly relevant to Plaintiff's bad faith claim. The Court further finds that Defendants' effort to distinguish the Equity Insurance Company cases - arguing that those cases concerned third-party benefits and compulsory insurance law (*id.* at 3-4) - is unpersuasive. [**10] The holding of the Oklahoma Supreme Court in each case was clear and unequivocal, and Oklahoma's public policy of protecting innocent third parties played no apparent part in the decision. Instead, applying a notice provision like the one in Lyndon's policy [*1272] in this case, the Oklahoma Supreme Court elected to follow the weight of authority from other jurisdictions interpreting similar provisions to mean "that notice of cancellation for nonpayment of premium cannot be given before the premium is due." *See City of Jenks*, 184 P.3d at 544 (discussing cases). Specifically, the supreme court held: "Equity's notice of its intent to cancel the policy at a future date if an installment premium was not paid was ineffective notice of cancellation for nonpayment of premium under the terms of the policy." *Id.* at 541-42. Further, after surveying the case law and explaining its rationale, the court announced: "Under the terms of the Equity policy, we find that effective notice of cancellation for nonpayment of premium cannot be given before the premium is due." *Id.* at 545.[4]

The Oklahoma Supreme Court reaffirmed these clear pronouncements a few months later, ruling that *City of Jenks* was dispositive of additional arguments advanced by other parties. In *St. Clair*, the supreme court reiterated its position: "To effectively cancel its automobile insurance policy for nonpayment [**12] of a premium in accordance with the policy terms, Equity must provide an insured at least a ten-day notice of its clear, unequivocal *in praesenti* act of canceling the policy *following* the insured's failure timely to pay the premium that was due." *St. Clair*, 196 P.3d at 984 (emphasis in original).

In this case, Defendants do not dispute that the notice provision of Lyndon's policy and Equity Insurance Company's policies are almost identical. *Compare City of Jenks*, 184 P.3d at 543, and *St. Clair*, 196 P.3d at 982 n.5, *with* Pl.'s Am. Pet. [Doc. No. 1-2], Ex. 2 (Policy at p.17). It is also undisputed that Defendants' notice of cancellation was given to Plaintiff before the installment payment was due. Because Defendants did not provide effective notice of cancellation for nonpayment, they could not properly cancel Plaintiff's insurance coverage. The Court therefore finds that Plaintiff's insurance policy remained in effect and no lapse in coverage occurred.

On the other hand, regarding Defendants' assessment of a reinstatement fee each time Plaintiff made an untimely installment payment, the Court cannot discern

---

The policy in the case at bar states that the company "may cancel" for nonpayment of premium. The use of the word "may" indicates that the insurer has the option to cancel the policy [**11] for nonpayment of premium. This language suggests to the insured that if he fails to pay an installment, the company may elect to cancel the policy, but it must give him ten days' notice if it does so. It would lead the insured to believe that a failure to pay the premium on or before the due date does not automatically result in cancellation, but merely gives rise to the possibility of cancellation.

We find that Equity Insurance Company's anticipatory notice of cancellation, conditioned upon [the insured's] failure to make the next installment payment when due, was ineffective to cancel the policy. If the insurer elects to cancel the policy for nonpayment of premium, then according to the policy terms it must give the insured a ten-day notice. Notice of *cancellation* cannot be given prior to occurrence of the event that triggered the insurer's option to cancel: nonpayment of premium.

*City of Jenks*, 184 P.3d at 545 (citation omitted, emphasis in original).

---

[4] The supreme court reasoned as follows:

any relevance of this issue to an actionable claim asserted by Plaintiff. The operative pleading is her state court Amended Petition [Doc. No. 1-2]. Allegations that "Jupiter improperly [**13] and without sufficient or proper notice . . . cancelled Plaintiff's policy of insurance in May 2017, June 2017, and July 2017" and that "Jupiter wrongly charged Plaintiff a fee of $15.00 to reinstate her policy of insurance in May 2017, June 2017, and July 2017" [*1273] (id. ¶¶ 36-37) are made solely to support a claim against Jupiter of tortious interference with contract. Id. at 4-7, ¶¶ 32-45 (Third Cause of Action). For reasons discussed *infra*, the Court finds that Jupiter is entitled to a judgment as a matter of law on the tortious interference claim. Therefore, there is no need to resolve whether Plaintiff's view of the collectability of a reinstatement fee is correct. If the Court were to render a decision on this issue, it would essentially be giving an advisory opinion, which is improper. Therefore, the Court declines Plaintiff's invitation to rule on whether Defendants improperly charged her a $15 fee.

## B. Plaintiff's Claim of Insurer's Bad Faith

Defendants assert that Plaintiff cannot prove that their handling of her insurance claim was unreasonable and constituted bad faith conduct.[5] They rely on the principle that the existence of a coverage dispute precludes liability; they "contend a legitimate [**14] dispute existed as to the date of Plaintiff's claim." *See* Def.'s Mot. at 7. Defendants also rely on the rule that bad faith "requires a showing of 'more than simple negligence.'" *Id.* at 8 (quoting *Badillo v. Mid Century Ins. Co.*, 2005 OK 48, 121 P.3d 1080, 1093 (Okla. 2005)).

Under Oklahoma law, an insurer has an "'implied-in-law duty to act in good faith and deal fairly with the insured to ensure that the policy benefits are received.'" *Badillo*, 121 P.3d at 1093 (quoting *Christian v. Am. Home Assur. Co.*, 1977 OK 141, 577 P.2d 899, 901 (Okla. 1977)); *accord Newport v. USAA*, 2000 OK 59, 11 P.3d 190, 195 (Okla. 2000). "[A]n insurer's right to resist payment or resort to a judicial forum to resolve a legitimate dispute" is well established. *Gov't Employees Ins. Co. v. Quine*, 2011 OK 88, 264 P.3d 1245, 1249 (Okla. 2011); *see Ball v. Wilshire Ins. Co.*, 2009 OK 38, 221 P.3d 717, 725 (Okla. 2009); *Brown v. Patel*, 2007 OK 16, 157 P.3d

117, 126-27 (Okla. 2007). "However, when presented with a claim by its insured, an insurer 'must conduct an investigation reasonably appropriate under the circumstances' and 'the claim must be paid promptly unless the insurer has a reasonable belief that the claim is legally or factually insufficient.'" *Newport*, 11 P.3d at 195 (quoting *Manis v. Hartford Fire Ins. Co.*, 1984 OK 25, 681 P.2d 760, 762 (Okla. 1984)); *see Buzzard v. Farmers Ins. Co.*, 1991 OK 127, 824 P.2d 1105, 1109 (Okla. 1991); *see also Bannister v. State Farm Mut. Auto. Ins. Co.*, 692 F.3d 1117, 1128 (10th Cir. 2012). An insurer's duty "to timely and properly investigate an insurance claim is intrinsic to an insurer's contractual duty to timely pay a valid claim." *Brown*, 157 P.3d at 122 (emphasis omitted). "If there is conflicting evidence from which different inferences may be drawn regarding the reasonableness of an insurer's conduct, then what is reasonable is always a question to be determined by the trier of fact [**15] by a consideration of the circumstances in each case." *Newport*, 11 P.3d at 195 (internal quotation omitted); *accord Badillo*, 121 P.3d at 1093.

Upon consideration of the summary judgment record, viewed in the light most favorable to Plaintiff as required by Rule 56, the Court finds that a genuine dispute of material facts precludes summary judgment on the issue of bad faith conduct. Plaintiff has presented sufficient facts from which reasonable jurors could find that Defendants did not conduct a timely investigation or take appropriate action under the circumstances and, instead, unreasonably denied Plaintiff's insurance claim based solely on her alleged [*1274] failure to provide proof that the loss occurred during the policy period. The reasonableness of Defendants' conduct to ensure that Plaintiff received the benefits of her insurance policy is reasonably subject to different conclusions and must be resolved by a trier of fact.

Therefore, the Court finds that Defendants are not entitled to summary judgment on Plaintiff's bad faith claim.

## C. Plaintiff's Claim of Tortious Interference with Contract

Jupiter asserts that Plaintiff's tortious interference claim against it fails as a matter of law because "the claim is viable only if the interferor [**16] *is not* a party to the contract or business relationship." *See* Defs.' Mot. at 10 (emphasis in original) (citing *Voiles v. Santa Fe Minerals, Inc.*, 1996 OK 13, 911 P.2d 1205, 1209 (Okla.

---

[5] Defendants do not deny that they both owed Plaintiff a duty of good faith and fair dealing; they question only whether the alleged conduct (primarily, Jupiter's claim handling on behalf of Lyndon) was sufficient to constitute bad faith.

1996), and *Wilspec Techs., Inc. v. Dunan Holding Group Co.*, 2009 OK 12, 204 P.3d 69, 74 (Okla. 2009)). Jupiter argues that Plaintiff cannot prevail on a claim that Jupiter interfered with her insurance contract with Lyndon where Jupiter "was a party to the contract and business relationship." *See* Defs.' Mot. at 10.

Plaintiff makes no effective response to this argument. Citing *Morrow Development Corp. v. American Bank & Trust Co.*, 1994 OK 26, 875 P.2d 411, 416 (Okla. 1994), she argues only: "That Jupiter's actions were pursuant to a contract it had with Lyndon Southern does not automatically and necessarily inoculate it from a tortious breach of contract [sic] claim." *See* Pl.'s Resp. Br. at 12 (footnote omitted, noting that Jupiter had not adduced proof of any contract with Lyndon).[6]

Oklahoma law prohibits a tortious interference claim against a defendant who was either a party or an agent acting on behalf of a party to the contract. The Oklahoma Supreme Court held as a matter of law in *Voiles*, 911 P.2d at 1210, that a defendant "cannot be liable for wrongfully interfering with a contract if it was acting in a representative capacity for a party to that contract." In so ruling, the court relied on an established legal principle. *See Ray v. Am. Nat'l Bank & Trust Co.*, 1994 OK 100, 894 P.2d 1056, 1060 (Okla. 1994) (affirming summary judgment for defendant who "was [**17] at all times acting on behalf of [contracting party]" because defendant "could not wrongfully interfere with a contract concerning which it was acting in a representative capacity for a party").

In this case, Plaintiff's tortious interference claim is based on Jupiter's actions in sending billing, cancellation, and reinstatement notices, in cancelling her insurance policy, in charging reinstatement fees, and "[i]n handing the administration of Plaintiff's policy and claim." *See* Am. Pet. ¶¶ 33-37, 39. From the pleading stage, however, it has been undisputed that Jupiter was responsible for administering the policy, payments, notices, and claims on behalf of Lyndon. Each of the written notices makes clear on its face that it was sent on Lyndon's behalf. The billing and cancellation notices bear both Jupiter's and Lyndon's names and request a payment that may be mailed directly to Lyndon. *See, e.g.*, Defs.' Mot., Exs. 2 & 3 [Doc. Nos. 47-2 and 47-3]. The reinstatement notices were sent in the form of a letter from Lyndon. *Id.* Ex. 4 [Doc. No. 47-4]. Plaintiff's insurance claim under the

policy was made directly to, and handled solely by, Jupiter on behalf of Lyndon. *See id.* Ex. 12 [Doc. [**18] No. 47-12] (claim file of both Jupiter and Lyndon); Ex. 13 [Doc. No. 47-13] (denial on Lyndon letterhead, signed [*1275] by Jupiter claim adjuster, stating Jupiter is providing policy and claims administration for Lyndon). Under the circumstances shown by the record, there can be no question that Jupiter was not meddling in Plaintiff's insurance contract with Lyndon but, instead, was performing it on Lyndon's behalf.

In short, Plaintiff's claim against Jupiter for allegedly interfering with her insurance contract with Lyndon is based solely on Jupiter's acts on behalf of Lyndon with respect to the contract. Therefore, the Court finds that this claim fails as a matter of law.

**D. Plaintiff's Fraud Claim**

Although not entirely clear, Jupiter seems to assert only that Plaintiff lacks proof of an essential element of a fraud claim - that is, a false misrepresentation of fact - because the claim is based solely on Jupiter's statements in billing and cancellation notices regarding the legal status of the policy. *See* Defs.' Mot. at 11. Plaintiff disputes this assertion. She argues that Jupiter also made material misrepresentations of fact during the handling of her insurance claim. Although one might [**19] argue that these alleged misrepresentations also concerned legal rather than factual matters - such as the types of evidence that Plaintiff must produce to substantiate her claim - the Court declines to entertain an argument that Jupiter has not actually made. Upon consideration of Defendants' Motion, the Court finds that Jupiter has failed to carry its initial burden under Rule 56 to demonstrate the absence of a dispute of material fact warranting summary judgment on Plaintiff's fraud claim.

**Conclusion**

For these reasons, the Court finds that Plaintiff is entitled to a determination as a matter of law that Defendants' cancellation of her coverage under the insurance policy was ineffective and that Jupiter is entitled to summary judgment on Plaintiff's claim for tortious interference with contract, but that summary judgment is not warranted on any other issue or claim addressed by the Motions.

IT IS THEREFORE ORDERED that Plaintiff's Motion for Partial Summary Judgment [Doc. No. 43] is GRANTED,

---

[6] The cited legal authority addresses when conduct may be privileged or excused. *See Morrow*, 875 P.2d at 417.

480 F. Supp. 3d 1265, *1275; 2020 U.S. Dist. LEXIS 150156, **19

as set forth herein, and that Defendants' Motion for Partial Summary Judgment [Doc. No. 47] is GRANTED in part and DENIED in part. Plaintiff's breach of contract claim against Defendant Lyndon Southern **[**20]** Insurance Company, her bad faith claim against both Defendants, and her fraud claim against Defendant Jupiter Managing General Agency, Inc. remain for trial.

IT IS SO ORDERED this 19th day of August, 2020.

/s/ Timothy D. DeGiusti

TIMOTHY D. DeGIUSTI

Chief United States District Judge

---

**End of Document**

**A** Neutral
As of: May 3, 2021 2:18 PM Z

# Med. Diagnostic Labs., LLC v. Health Care Serv. Corp.

United States Court of Appeals for the Tenth Circuit

May 6, 2019, Filed

No. 17-6189

**Reporter**
772 Fed. Appx. 637 *; 2019 U.S. App. LEXIS 13494 **; 2019 WL 1989834

MEDICAL DIAGNOSTIC LABORATORIES, LLC,
Plaintiff - Appellant, v. HEALTH CARE SERVICE
CORPORATION, a Mutual Legal Reserve Company
d/b/a BLUE CROSS BLUE SHIELD OF OKLAHOMA,
Defendant - Appellee.

**Notice:** PLEASE REFER TO FEDERAL RULES OF
APPELLATE PROCEDURE RULE 32.1 GOVERNING
THE CITATION TO UNPUBLISHED OPINIONS.

**Prior History:** [**1] (D.C. No. 5:16-CV-00902-D). (W.D.
Okla.).

Medical Diagnostic Labs., LLC v. Health Care Servs.
Corp., 2017 U.S. Dist. LEXIS 105976 (W.D. Okla., July
10, 2017)

## Core Terms

provider, in-network, laboratories, member-providers,
out-of-network, district court, preauthorization, testing,
Network, tortious interference, defamation, defamatory,
injunctive, motion to dismiss, specific service,
contractual, termination, patients, recommendation,
allegations, requests, labs

## Case Summary

### Overview
HOLDINGS: [1]-A laboratory's claim for tortious
interference against a health insurer was properly
dismissed because a letter reiterated the contractual
obligation that providers seek preauthorization before
using out-of-network companies such as the laboratory,
and such an assertion was not actionable; nothing in the
letter suggested that member-providers were precluded
from using the laboratory if they went through
preauthorization, or if their patients consented to paying
for the laboratory's testing services without requesting
insurance reimbursement; [2]-The laboratory did not
sufficiently plead existence of a defamatory statement
because pumping up the in-network providers did not
denigrate or degrade the laboratory.

### Outcome
Judgment affirmed.

## LexisNexis® Headnotes

Civil Procedure > Appeals > Standards of
Review > De Novo Review

Civil Procedure > ... > Defenses, Demurrers &
Objections > Motions to Dismiss > Failure to State
Claim

Civil
Procedure > ... > Pleadings > Complaints > Require
ments for Complaint

772 Fed. Appx. 637, *637; 2019 U.S. App. LEXIS 13494, **1

### HN1[⤓]  Standards of Review, De Novo Review

The appellate court reviews the grant of a Fed. R. Civ. P. 12(b)(6) motion to dismiss de novo applying the same legal standard used by the district court. All well-pleaded facts, as distinguished from conclusory allegations, are accepted as true and viewed in the light most favorable to the nonmoving party. Documents attached to the complaint are considered as part of the pleadings. To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face. The allegations in the complaint must be enough to raise a right to relief above the speculative level. A complaint containing merely labels and conclusions or a formulaic recitation of the elements of a cause of action is insufficient.

Torts > ... > Prospective Advantage > Intentional Interference > Elements

### HN2[⤓]  Intentional Interference, Elements

Under Oklahoma law, to state a claim for tortious interference with prospective economic advantage, the plaintiff must show: (1) the existence of a valid business relation or expectancy; (2) knowledge of the relationship or expectancy on the part of the interferor; (3) an intentional interference including or causing a breach or termination of the relationship or expectancy; and (4) resultant damage to the party whose relationship has been disrupted. In order to prevail, the plaintiff must show that the defendant used some intentional or improper conduct or means.

Torts > ... > Prospective Advantage > Intentional Interference > Defenses

### HN3[⤓]  Intentional Interference, Defenses

An actor's course of conduct is privileged if its primary focus was protection of the actor's legitimate economic interests rather than interference. And, although this privilege is not absolute and can be lost when the underlying motive is to harm another, asserting contractual rights does not amount to tortious interference.

Torts > Intentional Torts > Defamation > Elements

### HN4[⤓]  Defamation, Elements

Under Oklahoma law, a communication is defamatory if it tends to so harm the reputation of another as to lower him in the estimation of the community or to deter third persons from associating or dealing with him.

Torts > Intentional Torts > Defamation > Defamation Per Quod

Torts > Intentional Torts > Defamation > Defamation Per Se

### HN5[⤓]  Defamation, Defamation Per Quod

In a case of defamation per se, the statement is defamatory on its face. For defamation per quod, the plaintiff must plead the meaning the words have and that they would be understood to have.

Civil Procedure > ... > Injunctions > Grounds for Injunctions > Balance of Hardships

Civil Procedure > ... > Injunctions > Grounds for Injunctions > Likelihood of Success

Civil Procedure > ... > Injunctions > Grounds for Injunctions > Irreparable Harm

Civil Procedure > ... > Injunctions > Grounds for Injunctions > Public Interest

### HN6[⤓]  Grounds for Injunctions, Balance of Hardships

To state a claim for injunctive relief, the requesting party has the burden to show: (1) actual success on the merits; (2) irreparable harm unless the injunction is issued; (3) the threatened injury outweighs the harm that the injunction may cause the opposing party; and (4) the injunction, if issued, will not adversely affect the public interest.

**Counsel:** For MEDICAL DIAGNOSTIC LABORATORIES, LLC, Plaintiff - Appellant: Ronald Theodore Shinn, Jr., Mark D. Spencer, McAfee & Taft, Oklahoma City, OK.

For HEALTH CARE SERVICE CORPORATION, a Mutual Legal Reserve Company, DBA Blue Cross Blue Shield of Oklahoma, Defendant - Appellee: Martin J. Bishop, Alexandra M. Lucas, William Sheridan, Reed Smith, Chicago, IL.

**Judges:** Before MORITZ, MURPHY, and EID, Circuit Judges.

**Opinion by:** Allison H. Eid

## Opinion

[*639] ORDER AND JUDGMENT[*]

Plaintiff-Appellant Medical Diagnostic Laboratories, LLC (MDL) sued Blue Cross Blue Shield of Oklahoma (Blue Cross), an unincorporated division of Health Care Service Corporation (HCSC), in diversity, asserting state law tort claims for tortious interference with prospective economic advantage and defamation, and seeking injunctive relief. The district court granted Blue Cross's motion to dismiss the case under Fed. R. Civ. P. 12(b)(6) for failure to state a claim upon which relief can be granted. MDL appealed the dismissal of the complaint, asserting that the allegations were sufficient to survive a motion to dismiss. We agree with the district court and now affirm.

I.

MDL is a New Jersey limited liability company whose principal place of business [**2] is located in New Jersey. Compl. ¶¶ 6-7. HCSC (which does business as Blue Cross Blue Shield) is an Illinois corporation whose principal place of business is in Illinois. Id. ¶ 8. MDL provides diagnostic laboratory testing services,

specializing in unique, patented and patent-pending testing services for gynecological diseases. Id. ¶ 11.

HCSC administers "health care insurance plans across the country." Id. ¶ 19. Each HCSC division "maintains a 'network' of healthcare providers with which [it] has contracts generally known as 'provider agreements.'" Id. ¶ 22. After "a healthcare provider enters into a 'provider agreement . . . the provider becomes what is known colloquially as 'in-network.'" Id. ¶ 23. "In-network" providers allow HCSC's divisions to pay discounted rates for services provided to patients who have HCSC insurance plans. Id. ¶ 24. Blue Cross is the company's Oklahoma division. Id. ¶¶ 21-22.

MDL alleged that providers have incentives to enter into provider agreements because HCSC "control[s] significant portions of the healthcare market" in the regions in which it operates and "is able to direct significant amounts of business to providers that are 'in-network.'" Id. ¶ 25. [**3] MDL alleged that Blue Cross "controls approximately 61% of the private health care market in Oklahoma." Id. ¶ 26.

Blue Cross has two in-network laboratories in Oklahoma: Diagnostic Laboratory of Oklahoma (DLO) and Regional Medical Laboratory Inc. (RML). Id. ¶ 27. As alleged by MDL, neither of these in-network laboratories offers the "unique, patented, and proprietary testing that MDL offers," making their testing services less effective and more expensive than those offered by MDL. Id. ¶ 28.

MDL attached to its complaint approximately fifty letters from in-network Blue Cross member-providers to Blue Cross recommending that MDL become an in-network provider. Id. ¶ 29. Those letters stated that MDL offers unique clinical laboratory testing that assists the medical provider in making diagnoses of certain gynecological diseases. Blue Cross has taken no action to make MDL an in-network laboratory service provider in Oklahoma, although MDL alleged it is currently an in-network provider with HCSC in its Illinois and Texas divisions. Id. ¶ 31.

[*640] Blue Cross sent a letter to the member-providers in response to their provider letters of recommendation (the Response Letter). The Response Letter first [**4] notes that Blue Cross "periodically reviews out-of-network utilization." Aplt. App. at 20. Then the letter refers specifically to the letters of recommendation: "According to your correspondence, you are currently or are considering utilizing Medical Diagnostic Laboratory which is an out-of-network

---

[*] This order and judgment is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel. It may be cited, however, for its persuasive value consistent with Fed. R. App. P. 32.1 and 10th Cir. R. 32.1.

laboratory." *Id.* The letter goes on to state that DLO and RML, Blue Cross's in-network laboratories, "are able to provide the specific services outlined in [the recommendation] letter." *Id.* The letter then reproduces the text from Article II, Section 2.8 of the provider BlueChoice PPO contract. *Id.* at 21. Further, the letter requests that member-providers abide by the BlueChoice PPO contract, specifically that, pursuant to Article II, Section 2.8:

> Physician is required to refer his or her BlueChoice PPO Network Members to other BlueChoice PPO Network Participating Providers when such individuals require services that cannot be provided by Physician. In the event that Physician finds that the services of an out-of-network provider are required in order to provide the services needed by his or her BlueChoice PPO Network Member, arrangements for the services of an out-of-network provider can be obtained in the same manner as Preauthorization described in section [**5] below. Any specialty referrals for BlueChoice PPO Network Members participating in the Point of Service Program must be obtained from the BlueChoice PPO Network Member's Primary Care Physician.

*Id.* at 20. Finally, the letter states that if the provider continues to refer the provider's patients to out-of-network laboratories, "[Blue Cross] may choose to proceed with termination of [the member-provider's] contracts." *Id.* at 21.

In response to the letter, MDL wrote to Blue Cross demanding that it cease and desist intimidating member-providers who requested consideration for MDL to become an in-network provider. Compl. ¶ 41. MDL also alleged that at least one of the providers who wrote a recommendation letter to Blue Cross was twice contacted by telephone after receiving the letter. *Id.* ¶ 42. In the calls, HCSC told the provider to stop sending testing specimens to MDL or face possible termination of their Blue Cross provider agreement. *Id.*

MDL then filed suit, alleging that Blue Cross tortiously interfered with prospective economic advantage by causing providers and patients not to enter into or to discontinue relationships with MDL, and/or preventing MDL from acquiring prospective relations. *Id.* ¶ 60. MDL [**6] further alleged that Blue Cross defamed MDL to its in-network member-providers by issuing the letter. *Id.* ¶¶ 64-65. MDL alleged that since the letter it has lost physician referrals. *Id.* ¶ 72.

Blue Cross filed a motion to dismiss MDL's complaint, contending that MDL had failed to state a plausible claim for relief because (1) MDL did not plead the required elements of a tortious interference claim; (2) MDL did not identify any actionable statements by Blue Cross to support its defamation claim; and (3) MDL's request for injunctive relief is unconstitutionally broad and vague and would restrict Blue Cross's freedom of speech. Aplt. App. at 29-45.

The district court granted Blue Cross's motion to dismiss, holding that the complaint failed to state a claim upon which relief could be granted. *Id.* at 147. The district court offered MDL an opportunity to amend its complaint. MDL chose to file an appeal rather than amend its complaint. Aplt. Br. at 15 n.3.

[*641] II.

*HN1*[⬆] We review the grant of a Rule 12(b)(6) motion to dismiss de novo applying the same legal standard used by the district court. *Teigen v. Renfrow*, 511 F. 3d 1072, 1078 (10th Cir. 2007). All well-pleaded facts, as distinguished from conclusory allegations, are accepted as true and viewed in the light most favorable to the nonmoving party. [**7] *Id.* Documents attached to the complaint are considered as part of the pleadings. *Id.* "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S. Ct. 1937, 173 L. Ed. 2d 868 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007)). The allegations in the complaint "must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 545. A complaint containing merely "labels and conclusions" or "a formulaic recitation of the elements of a cause of action" is insufficient.[1] *Id.*

A.

*HN2*[⬆] Under Oklahoma law, to state a claim for tortious interference with prospective economic advantage,

> the plaintiff must show: (1) the existence of a valid

---

[1] "Because this is a diversity case, we rely on the substantive law of Oklahoma and apply federal procedural law." *Ahrens v. Ford Motor Co.*, 340 F.3d 1142, 1145 (10th Cir. 2003) (quotations omitted).

772 Fed. Appx. 637, *641; 2019 U.S. App. LEXIS 13494, **7

business relation or expectancy; (2) knowledge of the relationship or expectancy on the part of the interferor; (3) an intentional interference including or causing a breach or termination of the relationship or expectancy; and (4) resultant damage to the party whose relationship has been disrupted.

*Cohlmia v. St. John Medical Center*, 693 F.3d 1269, 1286-87 (10th Cir. 2012). "In order to prevail, the plaintiff must show that the defendant used 'some intentional or improper conduct or means.'" *Id.* at 1287 (quoting *Overbeck v. Quaker Life Ins. Co.*, 1984 OK CIV APP 44, 757 P.2d 846, 848 (Okla. Civ. App. 1984)). Because MDL cannot show that Blue Cross used "some intentional or improper conduct or means" in sending [**8] the Response Letter, it has failed to state a claim for tortious interference with prospective economic advantage.

Oklahoma law holds that*HN3*[⚓] an actor's course of conduct is privileged if its "primary focus" was protection of the actor's legitimate economic interests rather than interference. *Green Bay Packaging, Inc. v. Preferred Packaging, Inc.*, 1996 OK 121, 932 P.2d 1091, 1096 (Okla. 1996) (applying *Morrow Dev. Corp. v. Am. Bank & Trust Co.*, 1994 OK 26, 875 P.2d 411, 416 (Okla. 1994)). And, although this privilege is not absolute and can be lost when the underlying motive is to harm another,[2] asserting contractual rights—as was done here—does not amount to tortious interference. *See id.* Here, the Response Letter reiterates the provisions of the contract that require a member-provider to obtain preauthorization before referring a patient to an out-of-network provider. The Response Letter states that

> [i]n the event that Physician finds that the services of an out-of-network provider are required in order to provide the services needed by his or her BlueChoice PPO Network Member, arrangements for the services of an out-of-network provider can be obtained in the same manner as Preauthorization described in section below.

[*642] Aplt. App. at 21. The letter also states that if the member-providers refer a member to out-of-network providers, Blue Cross "may proceed" to terminate the member-providers [**9] contract with Blue Cross. *Id.*

The Response Letter states that Blue Cross will consider terminating a member-provider as an in-network provider if that provider continues to refer

patients to out-of-network laboratories such as MDL without prior authorization. MDL agrees with this reading of the letter. Compl. ¶ 37 ("The [Response Letter] threaten[s] to terminate the providers' 'in network' state with [Blue Cross] if the physician[s] continue[s] to refer samples to MDL without prior authorization"). But the fact that Blue Cross was simply reiterating the contractual provisions that allow out-of-network referrals only with preauthorization is fatal to MDL's claim. The act of enforcing contractual obligations is not actionable under Oklahoma law.

MDL asserts that the Response Letter goes beyond the assertion of contractual rights because the letter can be read to suggest that it will never grant preauthorization or that preauthorization requests are futile. We agree with the district court, however, that nothing in the letter suggests that member-providers are precluded from using MDL if they go through the proper preauthorization procedure, or if their patients consent to paying for MDL's [**10] testing services without requesting insurance reimbursement. Nor is there a suggestion in the letter that preauthorization requests will be automatically denied. On the contrary, the Response Letter recites the preauthorization procedures. Moreover, MDL's own complaint alleges that its tests are unique, and that Blue Cross is obligated to defer to the judgment of its providers regarding medically necessary services. Compl. ¶¶ 11, 51. The letter expressly states that providers must go through the preauthorization procedures if they are to use MDL. We decline MDL's invitation to find a hidden meaning that contradicts the express language of the letter.

In sum, the Response Letter reiterated the contractual obligation that providers seek preauthorization before using out-of-network companies such as MDL. Such an assertion of a contractual obligation is not actionable under the law of Oklahoma for tortious interference. Accordingly, we conclude that the district court properly dismissed MDL's claim for tortious interference.[3]

B.

We turn next to MDL's claim that the Response Letter

---

[2] MDL makes no claim that Blue Cross lost the contractual privilege under Oklahoma law.

[3] MDL asks this court to consider *Medical Diagnostic Laboratories, LLC v. Independence Blue Cross*, No. CV 16-5855, 2017 U.S. Dist. LEXIS 140256, 2017 WL 3776619 (E.D. Pa. Aug. 30, 2017). In that case, unlike here, there were allegations of withheld payments and existing contractual relationships. We therefore find the case inapposite.

772 Fed. Appx. 637, *642; 2019 U.S. App. LEXIS 13494, **10

was defamatory. *HN4*[⬆] "Under Oklahoma law, 'a communication [**11] is defamatory if it tends to so harm the reputation of another as to lower him in the estimation of the community or to deter third persons from associating or dealing with him.'" *Payne v. WS Services, LLC*, 216 F. Supp. 3d 1304, 1320 (W.D. Okla. 2016) (quoting *Wilson v. City of Tulsa*, 2004 OK CIV APP 44, 91 P.3d 673, 680 (Okla. Civ. App. 2004)) (brackets omitted). The district court found that MDL's complaint did not plausibly allege a defamatory statement because Blue Cross's statement that other laboratories can provide the specific services as outlined in the member-provider's letter did not lower the estimation of MDL in the community or deter others from associating with MDL. *See* Aplt. App. at 146. We agree.

[*643] MDL contends that if we take as true the allegation that "MDL offers unique proprietary tests not performed by either DLO, RML, or for that matter, any clinical laboratory in the Blue Cross network," then the statement in the Response Letter that Blue Cross "has verified that our In-Network Laboratories are able to provide the specific services as outlined in your letter" is defamatory. *See* Compl. ¶ 46; Aplt. App. at 12. More specifically, MDL contends that by stating that in-network providers can provide the "specific services" offered by MDL, the letter suggests that MDL testing is not "unique," which in turn caused medical providers to stop using MDL's services. [**12] But an analysis of the letter defeats this understanding.

First, the Response Letter states that the in-network labs can provide the "specific services" as outlined in the member-provider letter. The Response Letter does not suggest, contrary to MDL's argument, that the in-network labs provide the exact "same" services as MDL. The Response Letter simply states that the in-network labs can provide the "specific" category of tests that MDL provides, but it does not say that the tests are identical. This distinction, albeit small, is an important one, as there is nothing in the Response Letter to suggest that the MDL tests are not unique. Indeed, the Response Letter goes further by stating that the "each of [Blue Cross's] preferred labs" are available to "discuss [the member-provider's] specific testing needs." *Id.* Accordingly, MDL has not sufficiently pleaded the first element of a claim for defamation—the existence of a defamatory statement—and we proceed no further. *See Payne*, 216 F. Supp. 3d at 1320.

Our conclusion is the same whether we consider this a *HN5*[⬆] case of defamation per se, where the statement is defamatory on its face, *see Miskovsky v.*

*Tulsa Tribune Co.*, 1983 OK 73, 678 P.2d 242, 248-49 (Okla. 1983), or defamation per quod, where the plaintiff must "plead the meaning the words have [**13] and that they would be understood to have . . . ." *Id.* (citation omitted). In other words, we reach the same result whether we look just to the text of the Response Letter, or to the surrounding allegation that MDL testing is unique. In both instances, MDL must adequately plead the existence of a defamatory statement, which we find is lacking here.

MDL also alleges that the Response Letter caused it to suffer significant damages in lost business and that, again, its allegation of a causal connection between the Response Letter and its lost business must be taken as true at this stage. For the same reason, however, this argument fails. The question is not whether MDL suffered damages, but whether it has properly alleged that a defamatory statement caused those damages. Again, such an allegation is lacking in this case.

At most, the Response Letter attempts to shore up the reputation of the testing services offered by in-network labs by explaining that they provide the specific services outlined in the member-provider's letters. Aplt. App. at 20. Pumping up the in-network providers does not denigrate or degrade MDL. Accordingly, we conclude that dismissal of MDL's defamation claim was warranted.

C.

*HN6*[⬆] To state [**14] a claim for injunctive relief, the requesting party has the burden to show: "(1) actual success on the merits; (2) irreparable harm unless the injunction is issued; (3) the threatened injury outweighs the harm that the injunction may cause the opposing party; and (4) the injunction, if issued, will not adversely affect the public interest." *Fisher v. Okla. Health Care Auth.*, 335 F.3d 1175, 1180 (10th Cir. 2003) [*644] (citations omitted). Given our conclusion that MDL has failed to state a claim for either tortious interference or defamation, we affirm the district court's denial of injunctive relief.

D.

Finally, MDL requests that this court remand the case to allow it to amend its complaint. MDL did not file an amended complaint in the district court, and instead appealed to this court. Aplt. Br. at 15 n.3. Without the benefit of an amended complaint at the district court, we are left with no hint as to MDL's possible amendments and are thus left to speculate. Accordingly, we deny MDL's request to amend its complaint.

772 Fed. Appx. 637, *644; 2019 U.S. App. LEXIS 13494, **14

III.

For the reasons stated above, we affirm the judgment of
the district court.

Entered for the Court

Allison H. Eid

Circuit Judge

**End of Document**